## LEEP *v.* RAILWAY COMPANY.

Opinion delivered February 3, 1894.

1. *Constitutional law—Act prohibiting withholding of employee's wages.*

The act of March 25, 1889, which provides (sec. 1) that "whenever any railroad company or any company, corporation or person engaged in the business of operating or constructing any railroad or railroad bridge, or any contractor or sub-contractor engaged in the construction of any such road or bridge, shall discharge with or without cause, or refuse to further employ any servant or employee thereof, the unpaid wages of such servant or employee then earned at the contract rate, without abatement or deduction, shall be and become due and payable on the day of such discharge or refusal to longer employ ; and if the same be not paid on such day, then, as a penalty for such non-payment, the wages of such servant or employee shall continue at the same rate until paid," is, as to natural persons, an invasion of the right, secured by sec. 3 of art. 2 of the constitution, "of acquiring, possessing and protecting property;" but as to corporations the act is a valid exercise of the right reserved by the constitution (art. 12, sec. 6, Const. 1874) "to alter, revoke or annul any charter of incorporation."

2. *Construction—Payment " without abatement or discount."*

> The requirement of the act of March 25, 1889, that wages earned shall be paid " without abatement or discount " means without discount on account of the payment thereof before they were due under the contract, and does not prevent the employer from offsetting any damages sustained by the employee's failure to perform his contract.

3. *Constitutional law—Special legislation.*

> The act of March 25, 1889, being general and uniform in its operation upon all persons coming within the class to which it applies, does not, (if amendments to charters can) come within the inhibition of the constitution (art. 5, sec. 25) against special legislation.

4. *Jurisdiction—Justice of the peace.*

> In providing that if the wages of a discharged servant or employee be not paid to him on the day of his discharge, " then, as a penalty for such non-payment, the wages of such servant or employee shall continue at the same rate until paid," the act of March 25, 1889, contemplates the payment of the additional sum not as a penalty but as compensation for the delay and punishment for the failure to pay, and in a proper case a justice of the peace has jurisdiction of a suit for recovery of the amount due under the statute.

Appeal from Pulaski Circuit Court.

ROBERT J. LEA, Judge.

*Marshall & Coffman* for appellant.

The act of March 25, 1889, is not unconstitutional. If it is a legitimate exercise of the police power, there is nothing in the Constitution of the United States, or any of its amendments, to interfere. 123 U. S. 623 ; 140 *ib.* 545. Nor is there in the State constitution, for no State or people can part with this power by contract or otherwise. 18 A. & E. Enc. Law, 745–6 ; 101 U. S. 814. This power extends to the prohibition of all things hurtful to society, so reasonably exercised as not to invade constitutional rights, as defined by the courts. 10 L. R. A. 135 and note ; 18 A. & E. Enc. L. 740 ; 3 *ib.* 689 ; 67 Ill. 37 ; 70 *id.* 192 ; Tied. Lim. Police Power, secs. 1, 2, 3. Railroads, engaged in business affecting the public interest, are subject to police regulations as

to charges and many other things. The test is whether the act is designed and does tend to protect some public or private right from some injurious act. Tied. Lim. Pol. Power, 561, 590, 594–9; 63 Me. 269; 27 Vt. 140; 94 U. S. 113; *Ib.* 155; 143 U. S. *(Budd* v. *People);* 120 Mass. 283. The relation of employer and employee, when connected with a public interest, safety and welfare, are the subject of police regulation. Tied. Lim. of Police Powers, sec. 179. The legislative opinion that police regulation in this regard is necessary is final. The responsibility is purely political, no appeal lying except to the people at the polls. 123 U. S. 623; 127 *id.* 678; 18 A. & E. Enc. Law, 746–7. The act was passed to correct an evil—the discharge of employees without warning. The efficiency of the public service depends upon prompt payment and proper employment and discharge of employees. It does not attempt to fix the wages of laborers, or control the right to contract, but to render the discharge ineffectual until his wages are paid, nor does it injure the company. If the business of *constructing* railroads and bridges is not affected with a public interest, that part of the act may be stricken out, and the rest allowed to stand. 37 Ark. 356 and subsequent cases. It may be held to extend to *corporations* only which are the subject of legislative control. Our constitution gives the power " to correct *abuses*, prevent discriminations and *unjust charges*," etc., and to "alter, revoke or annul any charter   *   *   whenever *in their opinion* it may be injurious to citizens," so that no injustice be done to corporators. This gives the legislature power to recall every right, privilege or immunity derived directly from the State. 99 U. S. 700; 95 *id.* 319; 8 A. & E. Enc. Law, 628. The only limit is that property or rights which have become vested cannot be taken away. *Ib.* 629, 633; 111 N. Y. 46, and cases *supra*; 15 Wall. 459. Corporations have no inherent

right to make contracts, and the act does not invade the right of the laborer. It does not impair any obligation. It is prospective in its operation. 121 U. S. 388. See the following cases illustrative of the principle contended for. 6 Atl. Rep. 354; 10 S. E. Rep. 285; 9 West. Jur. 347; 16 Wall. 678; 19 A. & E. Enc. Law, 780–5; 8 *ib.* 628–9; 7 N. E. Rep. 631; 110 Ill. 590; 23 N. E. Rep. 253; 55 Md. 79; 2 Q. B. 281; 20 S. W. Rep. 332; 22 S. W. Rep. 350; 31 N. E. Rep. 395; 32 *id.* 364; 25 Atl. 246; 32 N. E. Rep. 978; 19 S. W. Rep. 910. The act does not deny defendant its day in court, or take its property without due process of law. 115 U. S. 512; 129 *id.* 26; Cooley, Const. Lim. 353–8; 96 U. S. 97. The freight act was sustained in 49 Ark. 291, and the passenger rate act in 49 *id.* 455. The stock law in 49 Ark. 492 stands on different grounds. See *Baty* v. *Railway*, 6 Neb. The act is not special, unequal or class legislation within the fourteenth amendment, or any provision of our State constitution. It treats all alike, under similar circumstances and conditions. 35 Ark. 69; 49 *id.* 167, 291, 455; 48 *id.* 371; 52 *id.* 529; 33 *id.* 816; 15 *id.* 16; Cooley, Const. L. 390–3; 3 A. & E. Enc. L. 595–8; 8 *ib.* 623, note 1; 101 U. S. 22; 113 *id.* 27, 703; 115 *id.* 321, 512; 127 *id.* 205; 114 *id.* 606; 40 Minn. 117.

*Dodge & Johnson* for appellee.

The act of March 25, 1889, is unconstitutional and void.

1. It is violative of the bill of rights. Const. art. 2. secs. 3, 21; art. 19, sec. 13. The right to make contracts is inalienable. Three classes of citizens are singled out, and a special law enacted for them alone. Such legislation is discountenanced in 49 Ark. 493. See also 65 Ala. 199.

2.   The act violates sec. 7, art. 2, and sec. 13, *ib.* const.   It destroys the right of trial by jury.   28 Ark. 461; 8 *id.* 446; 16 *id.* 384.

3.   It violates art. 2, secs. 3, 18 and 29, const.   It is *class* legislation of the boldest and baldest character— an unjust discrimination in favor of a certain class of employees against a certain class of employers.   6 Neb. 37 ; 60 Miss. 641 ; 20 A. & E. R. Cases, 555.

4.   The act is *special* legislation, and violative of secs. 25 and 26, art. 5, const.   38 N. W. Rep. 660 ; *Ib.* 201; Cooley, Const. Lim. marg. p. 391 ; 100 U. S. 303; 89 Ill. 60 ; 3 Mo. 326 ; 4 *id.* 140 ; 11 Mass. 396 ; 5 Pick. 65 ; 3 Humph. 433 ; 2 Yerg. 260 ; 20 Cal. 135 ; 21 Wis. 492 ; 25 *id.* 560 ; 4 Heisk. 357 ; 2 Yerg. 554 ; 24 Am. Dec. 511.

5.   It violates sec. 1, 14th amend. Const. U. S.; 101 U. S. 30 ; 5 Cr. 61 ; 20 Wall. 455 ; 3 Biss. 481 ; 2 Gall. 135 ; 37 Barb. 455 ; 19 Cal. 246 ; 67 *id.* 594 ; 4 Otto, 544 ; 3 Sawyer, 157 ; 100 U. S. 318 ; *Ib.* 339-46 ; 48 Cal. 50 ; 5 *id.* 74 ; 100 U. S. 345 ; 74 N. Y. 191 ; 17 Alb. L. J. 225 ; 4 Wheat. 519 ; 12 N. Y. 209 ; Cooley, Const. Lim. p. 355 ; 4 Conn. 209.

6.   It is a special and not a general act, and is violative of Federal and State constitutional prohibitions. 6 Atl. Rep. 354 ; 127 Ill. 294 ; 7 N. H. 631 ; 4 Pac. Rep. 801 ; 55 Cal. 555 ; 6 Neb. 37 ; 8 Rep. 195 ; 28 Grat. 840 ; 57 Cal. 604 ; 6 Am. Law Reg. (N. S.) 378 ; 6 Law Rep. 359 ; 113 Pa. St. 431 ; 4 Cent. Rep. 887 ; 33 W. Va. 179 ; 115 Pa. St. 131 ; 117 Ill. 294.

7.   It is an act of paternalism, contrary to our form of government, and violative of the spirit and intention of our organic law.   19 S. W. Rep. 910; 143 U. S. 551 ; 33 Cent. L. J. 237 ; 26 Pac. Rep. 824 ; 119 Ill. 294 ; 34 Cent. L. J. 78 ; 90 N. Y. 52.   The act is class legislation, and an unjust interference with the rights, privileges and property both of employer and employee, and

places upon both the badge of slavery, by denying to one the right to manage his own business, and assuming that the other has so little capacity and manhood as to be unable to protect himself and manage his own private affairs. Every one has a right to adopt and follow any lawful pursuit not injurious to the community. He has the right to labor, and employ labor, and make contracts in respect thereto; to enforce all lawful contracts; to sue and give evidence; and to own, purchase and sell property. The deprivation of these rights is slavery and oppression.

BATTLE, J.   The St. Louis, Iron Mountain and Southern Railway Company is a corporation duly organized according to the laws of Arkansas, and is engaged in operating a railroad in this State. S. P. Leep was employed to work for it at the rate of $35 per month of thirty days, and labored under his contract until the 9th of September, 1890, when he was discharged. On the same day he demanded of the company his unpaid wages that were then due, amounting at the contract rate to the sum of $27.90. The company failed to pay then, but promised that it would on the 18th of September, 1890. Leep refused to wait until the day of the promised payment, and brought suit before a justice of the peace for the amount due to him, the $27.90, and also for a penalty for the non-payment of the same on the day he was discharged, at the contract rate from the time of such discharge to the day of bringing the suit. He recovered a judgment for $36.61 and costs. The defendant then appealed to the Pulaski circuit court. He recovered judgment in that court against the defendant for $27.90 and costs, but no penalty or damages; and, failing to recover the penalty, he appealed to this court.

He bases his claim to a penalty or damages upon the act of the general assembly, which is in the following words:

"SECTION 1.  Whenever any railroad company or any company, corporation or person engaged in the business of operating or constructing any railroad or railroad bridge, or any contractor or sub-contractor engaged in the construction of any such road or bridge, shall discharge, with or without cause, or refuse to further employ any servant or employee thereof, the unpaid wages of any such servant or employee, then earned at the contract rate, without abatement or deduction, shall be, and become due and payable on the day of such discharge, or refusal to longer employ ; and if the same be not paid on such day, then, as a penalty for such non-payment, the wages of such servant or employee shall continue at the same rate until paid. *Provided*, Such wages shall not continue more than sixty days, unless an action therefor shall be commenced within that time.

"SEC. 2.  That no such servant or employee who secretes or absents himself to avoid payment to him, or refuses to receive the same when fully tendered, shall be entitled to any benefit under this act for such time as he so avoids payment.

"SEC. 3.  That any such servant or employee whose employment is for a definite period of time, and who is discharged without cause before the expiration of such time, may, in addition to the penalties prescribed by this act, have an action against any such employer for any damages he may have sustained by reason of such wrongful discharge, and such action may be joined with an action for unpaid wages and penalty."   (Acts, 1889, ch. 61.)

This act applies to corporations, companies and persons engaged in the business of operating or constructing railroads or railroad bridges, and to contractors and sub-contractors engaged in the construction of any such road or bridge, and requires them to pay their

1. Act of March 25, 1889, held constitutional in part.

employees, on the day of discharge or of the refusal to further employ them, the unpaid wages then earned by them at the contract rate, without abatement or deduction. The object of the act is to make it unlawful for such companies, corporations, persons, contractors, or sub-contractors to contract to pay the wages of those employed by them in the operating of railroads or in the construction of such roads or bridges at any time subsequent to the day on which the employees may be discharged, or on which such employer may refuse to longer employ them. In other words, it declares the wages shall be paid on such day, notwithstanding they may not be due according to the contract until a day subsequent. In this respect the act attempts to limit the right to contract. Is it constitutional?

The constitutionality of a legislative act is to be determined solely by reference to those limitations which the constitution imposes. No court ought to "declare a statute unconstitutional and void," says Judge Cooley, "solely on the ground of unjust and oppressive provisions, or because it is supposed to violate the natural, social or political rights of the citizen, unless it can be shown such injustice is prohibited or such rights are guaranteed or protected by the constitution." The judiciary and the legislature are co-ordinate departments of the government; neither of which has a right to invade the province of the other. In determining the validity of a statute, the sole question for the courts to decide is one of power, not of expediency, justice or wisdom. In deciding such questions, they should, in the spirit of the comity and good will that should prevail between the different departments of the government, resolve all doubts in favor of the constitutionality of the acts of the legislature; and, if any act be reasonably susceptible of two constructions, one of which would render it unconstitutional and the other valid, should

give to it the latter, on the presumption that the legislature did not intend to exceed its power. Cooley on Con. Lim. (6th ed.) pp. 157, 200, 203, 208; *Sinking Fund Cases*, 99 U. S. 700, 718; *Munn* v. *Illinois*, 94 U. S. 113; *Powell* v. *Commonwealth*, 114 Pa. St. 292; *Missouri Pacific Ry. Co.* v. *Humes*, 115 U. S. 520.

According to the foregoing test, is the act under consideration constitutional? Section 3 of article 2 of the constitution of this State declares: "All men are created equally free and independent, and have certain inherent and inalienable rights; amongst which are those of enjoying and defending life and liberty; of acquiring, possessing and protecting property and reputation; and of pursuing their own happiness. To secure these rights governments are instituted among men, deriving their just powers from the consent of the governed." Section 8 of the same article ordains that no person shall "be deprived of life, liberty or property, without due process of law." Section 1 of the 14th amendment to the Constitution of the United States provides: "No State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any State deprive any person of life, liberty, or property, without due process of law, nor deny to any person within its jurisdiction the equal protection of the laws."

The right to acquire and possess property necessarily includes the right to contract; for it is the principal mode of acquisition, and is the only way by which a person can rightly acquire property by his own exertion. Of all the "rights of persons" it is the most essential to human happiness.

But the right to contract is not unlimited. The conflicting interests of individuals make this impossible. Rights in conflict with each other cannot be unlimited. Duties to persons, to society, the public and the govern-

ment are imposed on every individual. Every man, when he enters into society, undertakes to perform these duties; and necessarily surrenders some rights or privileges on account of his relation to others. His right to contract becomes subject to these duties; among which is the duty to so conduct himself and use his own property as to not unnecessarily injure another. He submits himself to such restraints and burdens as may conduce to the general comfort, health and prosperity of the State. To conserve and enforce these rights and duties the government can impose such restrictions upon his actions as may be appropriate for that purpose. "This power inheres in every sovereignty, and is essential to the maintenance of public order and the preservation of mutual rights from the disturbing conflicts which would arise in the absence of any controlling, regulating authority."

The legislature can control, to some extent, the right to contract in reference to property "clothed with a public interest, when used in a manner to make it of public consequence, and affect the community at large." "By devoting his property to a use in which the public has an interest, the owner, in effect, grants to the public an interest in that use, and subjects himself to the control of the legislature for the common good, to the extent of the interest he has thus created. Upon this principle, the legislature can fix the maximum of charges for the storage of grain in public warehouses, and for carriage of freight and passengers by common carriers. From the same source comes the power to regulate millers. bakers, hackmen, ferries, wharfingers, inn-keepers, and the like; "and in so doing to fix the maximum of charge to be made for services rendered, accommodations furnished, and articles sold." *Munn* v. *Illinois*, 94 U. S. 113; *Budd* v. *New York*, 143 U. S. 517; *Dow* v. *Beidelman*, 125 U. S. 680; S. C. 49 Ark. 325; *Mobile* v. *Yuille*,

3 Ala. (N. S.) 140. Upon the same principle it was held in *Spring Valley Water Works* v. *Schottler*, 110 U. S. 347, "that it is within the power of the government to regulate the price at which water shall be sold by one who enjoys a virtual monopoly of the sale."

It has been held by the courts that the legislature can regulate or prohibit the sale or manufacture of olemargarine, for the purpose of protecting the public against fraud. *Powell* v. *Com.* 114 Pa. St. 265 ; S. C. 127 U. S. 678 ; *State* v. *Addington*, 12 Mo. App. 214 ; S. C. 77 Mo. 110. Common carriers and telegraph companies cannot lawfully stipulate for exemption from responsibility for the negligence of themselves or their servants. *Railway* v. *Lesser*, 46 Ark. 236 ; *Liverpool Steam Co.* v. *Phœnix Ins. Co.* 129 U. S. 397 ; *Western Union Telegraph Co.* v. *Short*, 53 Ark. 434. No one can bind himself by an agreement not to engage in any particular business at any time or place. *Taylor* v. *Saurman*, 110 Pa. St. 3. Such contracts are void, because they are injurious to the public, contrary to public policy.

An act which made it unlawful for any person to transport or move, after sunset and before sunrise of the succeeding day, within certain counties, any cotton in the seed, but permitted the owner or producer to remove it from the field to his gin-house, or other place of storage, was held by the Supreme Court of Alabama to be constitutional. The court held that "its object was to regulate traffic in the staple agricultural product of the State, so as to prevent a prevalent evil, which, in the opinion of the law-making power, may have done much to demoralize agricultural labor and destroy the legitimate profits of agricultural pursuits, to the public detriment, at least within the specified territory. *Davis* v. *State*, 68 Ala. 58 ; *Mangan* v. *State*, 76 Ala. 60. Similar statutes have been held to be constitutional by other

courts. *State* v. *Moore*, 104 N. C. 714; *Butcher, etc. Co.* v. *Crescent, etc. Co.* 111 U. S. 746; *Boston Beer Co.* v. *Massachusetts*, 97 U. S. 25; *Herdic* v. *Roessler*, 109 N. Y. 127; *Brechbill* v. *Randall*, 102 Ind. 528.

There can be no violation of the constitution in the denial of the right to contract to those who are incapable of binding themselves thereby. The term "contract" implies "the existence of a physical and moral power of assenting, as well as a deliberate and free exercise of such power. The absence of any of these capacities in either of the parties to a contract renders the person laboring under it incapable of binding himself thereby." Hence restrictions were thrown around the exercise of this right by seamen. They sustained to the master of a ship a servile relation. At common law they owed to him obedience and respect; and in case of disobedience or disorderly conduct the master could punish them, because discipline is necessary, and "without it the ship would always be in great peril, and no voyage could be successfully conducted." The authority of the master over them was like unto that of a parent over his child, or of a master over his apprentice. This employment, and the usages and customs regulating it, constituted them a servile class, as helpless and dependent in many respects as that of an infant, and demanded the protection accorded to them.

The legislature has the power to prohibit the making of contracts, when it becomes necessary to protect the rights of others. As for example, it can provide by statute, as it did in Pennsylvania, that when the debtor and creditor, and a person or corporation owing money to the debtor, are residents of the State, it shall be unlawful for any citizen to send out of the State, by assignment or otherwise, for or without value, any claim against such debtor, with the intent to deprive him of his exemptions from execution by having collections out

of such money made in the courts of another State ; and
that the assignor, in such a case, shall be liable in an
action of debt, to the person from whom any such claim
shall have been collected, by attachment or otherwise,
outside of the courts of the State of his residence, for
the full amount collected. *Sweeny* v. *Hunter*, 145 Pa.
St. 363.

Another illustration of the power of the legislature
to restrict the right to contract when it becomes neces-
sary to protect others is furnished by the statutes of
this State.   It is the duty of every husband to take care
of, support and protect his wife and children, and pro-
vide them with a home.   To aid him in the discharge of
this duty, the constitution of this State declares "that
the homestead of any resident of this State, who is mar-
ried or the head of a family, shall not," except in certain
specified cases, "be subject to the lien of any judgment
or decree of any court, or to sale under execution or other
process thereon."   The obvious intent of this provision
was to secure to every resident, who is married or the
head of a family, a home, which he may improve and
make comfortable, where his wife and children "may be
sheltered and live beyond the reach of misfortunes which
even the most prudent and sagacious cannot always
avoid."   For the purpose of protecting the wife in the
enjoyment of this right, the statutes of this State pro-
vide "that no conveyance, mortgage or other instrument
affecting the homestead of any married man shall be of
any validity,   *   *   *   *   *   unless his wife joins in
the execution of such instrument and acknowledges the
same."

Other instances of statutory regulations of the right
to contract may be found in the statutes of many States
prohibiting the taking of usury.   They rest upon a
traditional policy antedating constitutions.   They "pro-
ceed," says Mr. Justice Scholfield, in *Frorer* v. *People*,

·141 Ill. 171, ·'·upon the theory that the lender and bor-
rower 'of money do ·not occupy towards each other ·the
same relations of equality that parties do in contracting
with each other in regard to the loan or sale of· other
kinds of property, and that the borrower's necessities
deprive him of freedom in contracting, and place him at
the mercy of the lender." 'Lord Chief Justice Best, in
1825, in delivering the unanimous opinion of the twelve
judges in the House of Lords upon a question submitted
to them under the English usury laws, said : '' The
supposed policy of the usury laws in modern times is to
protect necessity against· avarice, to fix such a rate of
interest as will enable industry to employ with advan-
tage a borrowed capital, and thereby to promote labor and
increase national wealth, and to enable the State to bor-
row on better terms than could be made if speculators
could meet the minister in the 'money market on equal
terms." (*House of Lords*, 3 Bing. 193). So at last
they can be based on the right of the legislature to pro-
tect the public welfare.

The statutes of fraud are sometimes referred to for
the purpose of showing the power of the legislature to
control the right to contract. The object of these stat-
utes was to prevent fraud and perjuries. For this pur-
pose some of them provide that certain contracts shall be
in writing, in order to prevent controversies, litigation,
and false swearing as to the terms of the contract.
Others declare that certain deeds, conveyances and
transactions shall be void, because they defraud or tend
to defraud innocent persons. They are based on the
maxim, *Sic utere tuo ut alienum non lædas*. None of
them limit the right to contract, but regulate the exer-
cise of it. Mansfield's Digest, secs. 3371–3384. They
clearly come within the power of the legislature to pro-
tect the rights of persons, prevent wrongs, and enforce
honesty and fair dealing in the transactions of individuals.

We have thus far spoken of the limitations that can be imposed on the right to contract. We have seen that the power of the legislature to do so is based in every case on some condition, and not on the absolute right to control. We think it is obvious that the right to contract cannot be limited by arbitrary legislation which rests on no reason upon which it can be defended ; for, if it could, the right would cease to exist, and become a license revocable at the will of the legislature, and the government would become a despotism in theory, if not in fact. Such a power cannot exist, for, if it could, it would be subversive of the right to enjoy and defend liberty, to acquire and possess property, and to pursue happiness, declared to be inalienable by the constitution of this State.

When the subject of contract is purely and exclusively private, unaffected by any public interest or duty to person, to society, or government, and the parties are capable of contracting, there is no condition existing upon which the legislature can interfere for the purpose of prohibiting the contract or controlling the terms thereof. In *State* v. *Goodwill*, 33 W. Va. 179, the Supreme Court considered the constitutionality of a statute of West Virginia, which declared "that it shall not be lawful for any person, firm, company, corporation, or association engaged in mining coal, ore, or other minerals, or mining and manufacturing them or either of them, or manufacturing iron or steel, or both, or any other kind of manufacturing, * * * to issue for the payment of labor any order or other paper whatsoever unless the same purports to be redeemable for its face value in lawful money of the United States, bearing interest at a legal rate, made payable to employee or bearer, and redeemable within a period of thirty days by the person, firm, company, corporation or association giving, making or issuing the same." The court held that the statute

was unconstitutional and void, and said : "The property which every man has in his own labor, as it is the original foundation of all other property, so it is the most sacred and inviolable. The patrimony of the poor man lies in the strength and dexterity of his own hands ; and to hinder him from employing these in what manner he may think proper, without injury to his neighbor, is a plain violation of this most sacred property. It is equally an encroachment both upon the just liberty and rights of the workman and his employer, or those who might be disposed to employ him, for the legislature to interfere with the freedom of contract between them, as such interference hinders the one from working at what he thinks proper, and at the same time prevents the other from employing whom he chooses. A person living under the protection of this government has the right to adopt and follow any lawful industrial pursuit, not injurious to the community, which he may see fit ; and, as incident to this, is the right to labor or employ labor, make contracts in respect thereto upon such terms as may be agreed upon by the parties, to enforce all lawful contracts, to sue and give evidence, and to inherit, purchase, lease, sell or convey property of any kind. The enjoyment or deprivation of these rights and privileges constitutes the essential distinction between freedom and slavery; between liberty and oppression."

A Missouri statute made it unlawful "for any corporation, person or firm engaged in manufacturing or mining to issue for the payment of wages, any order, check, or other token of indebtedness, payable otherwise than in lawful money, unless the same is negotiable and redeemable at its face value, in cash, or in goods, at the option of the holder, at the store or other place of business of the corporation, person or firm ;" and provided that the order, check, memorandum, or other evidence of indebtedness so issued should, upon presentation and

demand, within thirty days from date or delivery there-
of, be redeemed by the person or corporation issuing the
same, in goods, at the current cash market price for like
goods, or lawful money, as may be demanded by the
holder. In *State* v. *Loomis*, 22 S. W. Rep. 350, the
Supreme Court of Missouri (Barclay, J., dissenting) held
this statute unconstitutional. Similar statues were held
unconstitutional in *Godcharles* v. *Wigeman*, 113 Pa. St.
431 ; *State* v. *Fire Creek Coal & Coke Co.* 33 W. Va.
118 ; *Ramsey* v. *People*, 142 Ill. 380; and *Braceville
Coal Co.* v. *People*, (Ill.), 35 N. E. Rep. 62.

In *Com.* v. *Perry*, 155 Mass. 117, the statute under
consideration provided that "no employer shall impose a
fine upon or withhold the wages or any part of the
wages of an employee engaged at weaving for imper-
fections that may arise during the process of weaving."
The court held that the statute was unconstitutional,
and in doing so said: "Article 1 of the declaration of
rights of the constitution of Massachusetts enumerates
among the natural inalienable rights of men the right
of acquiring, possessing, and protecting property.  *
*  * The right to acquire, possess, and protect prop-
erty includes the right to make reasonable contracts,
which shall be under the protection of the law. The
manufacture of cloth is an important industry, essential
to the welfare of the community. There is no reason
why men should not be permitted to engage in it. In-
deed, the statute before us recognizes it as a legitimate
business into which anybody may freely enter. The
right to employ weavers, and to make proper contracts
with them, is therefore protected by our Constitution,
and a statute which forbids the making of such con-
tracts, or attempts to nullify them, or impair the obliga-
tion of them, violates fundamental principles of right which
are expressly recognized in our Constitution. If the stat-
ute is held to permit a manufacturer to hire weavers, and

agree to pay them a certain price per yard for weaving
cloth with proper skill and care, it renders the contract
of no effect when it requires him, under a penalty, to pay
the contract price if the employee does his work negli-.
gently, and fails to perform his contract. For it is an
essential element of such a contract that full payment is
to be made only when the contract is performed. If it
be held to forbid the making of such contracts, and to
permit the hiring of weavers only upon terms that
prompt payment shall be made of the price for good
work, however badly their work may be done, and that
the remedy of the employer for their derelictions shall be
only by suits against them for damages, it is an inter-
ference with the right to make reasonable and proper
contracts in conducting a legitimate business, which the
Constitution guarantees to everyone when it declares
that he has a natural, inalienable right of 'acquiring, pos-
sessing and protecting property.' Whichever interpre-
tation be given to this part of the act, we are of opinion
that it is unconstitutional."

In *San Antonio & Aransas Pass Railway* v. *Wil-
son*, 19 S. W. Rep. 910, it appears that the legislature
of Texas passed an act providing that, in the event a
railroad company shall refuse to pay, under certain cir-
cumstances, its indebtedness to an employee, within fif-
teen days after demand thereof, it shall be liable to pay
such employee twenty per cent on the amount due him
for damages, in addition to the amount due, and that
such damages shall not be less than five nor more than
one hundred dollars. The Supreme Court of Texas held
the act unconstitutional; and, among other things, said :
"Article 10, sec. 2 of the State constitution declares
that all railroads are public highways, and railroad com-
panies common carriers; that the legislature shall pass
laws to regulate freight and passenger tariffs; to correct
abuses and prevent unjust discrimination and extortion in

the rates of freight and passenger tariffs on the different railroads in this State, and enforce the same by adequate penalties; and, to the further accomplishment of these objects and purposes, may provide and establish all requisite means and agencies invested with such powers as may be deemed adequate and advisable. * * * There is no question as to the scope of this section of our constitution. Its provisions necessarily refer to and contemplate all injuries to the public arising out of a violation of duties due by the railway company to the public as a common carrier. Within this broad field, it rests with the legislature to determine what are those duties to the public, and what constitute abuses and injuries, and also what remedies are necessary to prevent them; and to decide whether the abuses shall be corrected through statutes which declare the act or acts to be a crime punishable as such, or whether the act or acts shall be corrected through a civil action, with punitive damages. * * * But when we consider the relation of railway companies to their own servants, both as to acts of employment and payment, we find a field in which special legislation has no right ordinarily to enter, and in which railways stand on the same footing with all other corporations or persons, and which cannot be contemplated or included within the scope of section 2, art. 10. * * * * * We think the position taken by appellant is correct, and section 2, art. 10, contemplates only the public duties of railways, and excludes all right of interference with the employment or payment of their servants."

The Texas act, as it appears from the quotation we have made, was held to be unconstitutional, because the constitution of Texas confined legislation in respect to railroads to the duties they owe to the public as common carriers, and excludes all right of interference by the legislature with the employment or payment of their

servants.   Article 10, section 2, of the Texas constitution, so far as it is set out in the last case referred to, is substantially incorporated into our constitution, except there is no provision in ours expressly authorizing the establishment of means and agencies with power to enforce it as to railroads ; and it does not appear in the opinion in that case that there is any power reserved in Texas to the legislature to amend or repeal charters.

An Indiana statute "forbade the execution of contracts waiving the payment of wages in money."   This statute was held to be constitutional in *Hancock* v. *Yaden*, 121 Ind. 366, on the ground that it "protected and maintained the medium of payment established by the sovereign power of the nation."

A statute of West Virginia prohibited the payment of employees in paper redeemable otherwise than in lawful money ; and another provided that coal should be weighed and measured, before it is screened, in a certain way, and that all coal paid for by weight, shall be paid for according to such weight, at the price agreed on, and that all coal paid for by measure shall be paid for according to such measure at the contract rate.   The court, in *Peel Splint Coal Co.* v. *State*, 15 S. E. Rep. 1000, held that these statutes were constitutional, two judges dissenting.   The court said :   "We base this decision in this case, *first*, upon the ground that the defendant is a corporation in the enjoyment of unusual and extraordinary privileges, which enables it and similar associations to surround themselves with a vast retinue of laborers, who need to be protected against all fraudulent or suspicious devices in the weighing of coal or in the payment of labor ; *secondly*, the defendant is a licensee, pursuing an avocation which the State has taken under its general supervision for the purpose of securing the safety of employees, by ventilation, inspection, and governmental report, and the defendant, there-

fore, must submit to such regulations as the sovereign thinks conducive to public health, public morals, or public security."

*Hancock* v. *Yaden, supra,* and *Peel Splint Coal Co.* v. *State, supra,* are against the weight of authority, but they do not hold that the legislature has the absolute power to limit the right to contract.

The legislature cannot regulate or restrain the right of individuals to contract by making it unlawful for them to agree with each other that wages shall be paid at any specified time subsequent to the day on which the labor by which they are earned shall be completed, or that the price of property sold shall be paid on a day subsequent to the sale. Such a contract as to the time of performance is necessarily harmless, of purely and exclusively private concern, and cannot affect any one except the parties. It is an important means used in the acquisition of property, which sells for more on time than for cash. Labor commands higher wages when they are payable in the future than it does when they are paid at the time of performance. A large proportion of the business of the world is transacted on a credit. Nations, states, counties, towns and persons contract debts payable in the future. Property is sold on time under executions, judgments and decrees of courts. The right of persons to sell or labor on a credit is everywhere and by all recognized as legitimate, and is protected by the constitution in the declaration that the right to acquire and possess property is inalienable.

But what is true of persons is not always true of corporations. Natural persons do not derive the right to contract from the legislature. Corporations do. They possess only those powers or properties which the charters of their creation confer upon them, either expressly, or as incidental to their existence; and these

may be modified or diminished by amendment or extinguished by the repeal of the charters.

The constitution of 1874 (art. 12, sec. 6.) ordains: "Corporations may·be formed under general laws; which laws may, from time to time, be· altered or repealed. The general assembly shall have the power to alter, revoke or annul any charter of incorporation now existing and revocable at the adoption of this constitution, or any that may hereafter be created, whenever, in their opinion, it may be injurious to the citizens of this State; in such manner, however, that no injustice shall be done to the corporatiors." The constitution of 1868 (art. 5, sec. 48) declared: "The general assembly shall pass no special act conferring corporate powers. Corporations may be formed under general laws; but all such laws may, from time to time, be altered or repealed." Under these constitutions the general assembly·has enacted statutes providing for the organization of corporations; and from them the corporations of this State derive their powers subject to the power of the legislature to change them by amending the laws under which they were organized.

As said by Mr. Justice Miller, in *Greenwood* v. *Freight Co.* 105 U. S. 13, 19 : "A short reference to the origin of this reservation of the right to repeal charters of corporations may be of service in enabling us to decide upon its office and effect when called into operation by the legislative exercise of the ·power." Continuing, he said, in the same case: "As early as 1806, in the case of *Wales* v. *Stetson*, (2 Mass. 143,) the Supreme Court of that State made the declaration 'that the rights legally vested in all corporations cannot be controlled or destroyed by any subsequent statute, unless a power for that purpose be reserved to the legislature in the act of incorporation.' In *Trustees of Dartmouth College* v. *Woodward* (4 Wheat. 518), decided in

1819, this court announced principles on the subject of the protection that the charters of private corporations were entitled to claim, under the clause of the Federal constitution against impairing the obligation of contracts, which, though received at the time with dissatisfaction, have never been overruled in this court. The opinion in that case carried the protection of the constitutional provision somewhat in advance of what had been decided in *Fletcher* v. *Peck* (6 Cranch, 87) and the preceding cases, and held that it applied not only to contracts between individuals, and to grants of property made by the State to individuals or to corporations, but that the rights and franchises conferred upon private as distinguished from public corporations by the legislative acts under which their existence was authorized, and the right to exercise the functions conferred upon them by the statute, were, when accepted by the corporators, contracts which the State could not impair. It became obvious at once that many acts of incorporation which had been passed as laws of a public character, partaking in no general sense of a bargain between the States and the corporations which they created, but which yet conferred private rights, were no longer subject to amendment, alteration, or repeal, except by the consent of the corporate body, and that the general control which the legislatures creating such bodies had previously supposed they had the right to exercise, no longer existed. It was, no doubt, with a view to suggest a method by which the State legislatures could retain in a large measure this important power, without violating the provision of the Federal constitution, that Mr. Justice Story, in his concurring opinion in the Dartmouth College case, suggested that when the legislature was enacting a charter for a corporation, a provision in the statute reserving to the legislature the right to amend or repeal it must be held to be a part of the con-

tract itself, and the subsequent exercise of the right would be in accordance with the contract, and could not, therefore, impair its obligation."

In order to avoid the consequences of the rule laid down in the Dartmouth College case, many States have availed themselves of Judge Story's suggestion. In chartering the Union Mining Company the legislature of Maryland reserved the right to amend or repeal its charter at pleasure. Afterwards it passed an act providing "that every corporation engaged in mining or manufacturing, or operating a railroad in Allegany county, and employing ten hands or more, shall pay its employees the full amount of their wages in legal tender money of the United States," and "that every such employee shall be entitled to receive from any such corporation employing him, the whole or so much of the wages earned by him as shall not have been actually paid to him in legal tender money of the United States without set-off or deduction of his demand in respect of any account or claim whatever." The Union Mining Company was sued after the enactment of this act by Shaffer & Munn for wages due to its employees. Mr. Justice Irving, in commenting on this act, in that case, said : "It being conceded that the legislature, when it incorporated the Union Mining Company, reserved the right to alter or amend its charter at pleasure, there can be no doubt that the legislature could enact a law prohibiting the corporation from paying its employees otherwise than in money, and that it could forbid the corporation from making contracts with them for payment in anything but money. * * * The acceptance by the corporation of a charter, with the reservation of the right to alter and amend, made that provision a part of the contract, which, as between the legislature and it, as a private corporation, it must be understood to be. A corporation has no inherent or natural rights like a

citizen. It has no rights but those which are expressly conferred upon it, or are necessarily inferrible from the powers actually granted, or such as may be indispensable to the exercise of such as are granted. A private corporation is only a *quasi* individual, the pure creation of the legislative will, with just such powers as are conferred expressly or by necessary implication and none others. Whatever, therefore, may have been the mischief intended to be reached and prevented by this law, by restrictions imposed on the corporation, it was competent for the legislature by this law, which operates as an amendment of its charter, to accomplish." *Shaffer & Munn* v. *Union Mining Co.* 55 Md. 74.

A statute of Rhode Island provides: "All acts of incorporation hereafter granted may be amended or repealed at the will of the general assembly, unless express provision be made therein to the contrary." The Brown & Sharpe Manufacturing Company was incorporated by the general assembly of Rhode Island for the purpose of manufacturing machinery, subject to a chapter of which this statute was a part. After the incorporation of it, the legislature passed an act requiring corporations to pay weekly the employees engaged in its business the wages earned by them to within nine days of the date of such payment, unless prevented by inevitable casualty. In *State* v. *Brown & Sharpe Manufacturing Company*, 25 Atl. Rep. 246, which was an action for the violation of this act, the Supreme Court of Rhode Island held that the act was constitutional, and that it operated as an amendment to the charter of the corporation sued, as it was a reasonable exercise of the power to amend.

In the *Sinking Fund Cases*, 99 U. S. 700, "the question was whether Congress had the constitutional power to enact a law compelling the Union Pacific and Central Pacific Railroad Companies to set aside a por-

tion of their current earnings as a sinking fund for the purpose of meeting a very large indebtedness secured by mortgage upon the roads, and payable at a future day. The majority of the court held that the legislation was valid as an exercise of the general legislative powers of the government, and also because the right to alter or amend the charters of the companies had been expressly reserved to Congress."

In commenting on the reserved power to amend or repeal the charters of corporations, in that case, Chief Justice Waite, in delivering the opinion of the court, said : "All agree that it cannot be used to take away property already acquired under the operation of the charter, or to deprive the corporation of the fruits actually reduced to possession of contracts lawfully made ; but, as was said by this court, through Mr. Justice Clifford, in *Miller* v. *The State* (15 Wall. 498), 'it may safely be affirmed that the reserved power may be exercised, and to almost any extent, to carry into effect the original purposes of the grant, or to secure the due administration of its affairs, so as to protect the rights of stockholders and of creditors, and for the proper disposition of its assets ;' and again, in *Holyoke Company* v. *Lyman* (*id*. 519), 'to protect the rights of the public and of the corporators, or to promote the due administration of the affairs of the corporation.'    Mr. Justice Field, also speaking for the court, was even more explicit when, in *Tomlinson* v. *Jessup* (*id*. 459), he said 'the reservation affects the entire relation between the State and the corporation, and places under legislative control all rights, privileges and immunities derived by its charter directly from the State ;' and again, as late as *Railroad Company* v. *Maine* (96 U. S. 510), 'by the reservation * * * the State retained the power to alter it (the charter) in all particulars constituting the grant to the new company, formed under it, of corporate rights, privileges, and im-

munities. 'Mr. Justice Swayne, in *Shields* v. *Ohio* (95 U. S. 324), says, by way of limitation, 'The alterations must be reasonable ; they must be made in good faith, and be consistent with the object and scope of the act of incorporation. Sheer oppression and wrong cannot be inflicted under the guise of an amendment or alteration.' The rules as here laid down are fully sustained by authority."

In speaking of the reserved power to amend or repeal the charters of corporations, Mr. Justice Gray, in delivering the opinion of the court in *Commissioners, etc.* v. *Holyoke Water Power Company*, 104 Mass. 451, said: "It is sufficient now to say that it is established by adjudications which we cannot disregard, and the principles of which we fully approve, that it at least reserves to the legislature the authority to make any alteration or amendment in a charter granted subject to it,. that will not defeat or substantially impair the object of the grant, or any rights which have vested under it,, and that the legislature may deem necessary to secure either that object or other public or private rights. Under such a clause, for instance, the legislature may make the stockholders of an incorporated bank liable for the future debts of the corporation. *Sherman* v. *Smith,* 1 Black, 587; S. C. *nom. In re Lee & Co.'s Bank,* 21 N. Y. 9. It may vary the measure, and thus enlarge the proportion of the profits which a mutual life insurance company is required by the terms of its charter to pay to a charitable institution. *Massachusetts General Hospital* v. *State Assurance Co.* 4 Gray, 227. Railroad corporations may be compelled, by general or special laws, to make changes in the level, grade and surface of the road-bed, new structures at crossings of other railroads or of highways, or station-houses at particular places, in a manner, and to be enforced by forms of process, different from those provided for or contem-

28

plated by the original charter, or the general laws in force when that charter was granted. *Roxbury* v. *Boston & Providence Railroad Co.* 6 Cush. 434 ; *Fitchburg Railroad Co.* v. *Grand Junction Railroad & Depot Co.* 4 Allen, 198 ; *Commonwealth* v. *Eastern Railroad Co.* 103 Mass. 254 ; *Albany Northern Railroad Co.* v. *Brownell*, 24 N. Y. 345, overruling *Miller* v. *New York & Erie Railroad Co.* 21 Barb. 513."

In *Spring Valley Water Works* v. *Schottler*, 110 U. S. 347, it appears that the constitution of the State of California "provided that corporations might be formed under general laws, and should not be created by special act, except for municipal purposes ; and that all laws, general and special, passed pursuant to that provision, might be, from time to time, altered and repealed. A general law was enacted by the legislature for the formation of corporations for supplying cities, counties and towns with water, which provided that the rates to be charged for water should be fixed by a board of commissioners, to be appointed in part by the corporation and in part by the municipal authorities. The constitution and laws of the State were subsequently changed so as to take away from corporations which had been organized and put into operation under the old constitution and laws the power to name members of the boards of commissioners, and so as to place in the municipal authorities the sole power of fixing rates for water." The court held that "these changes violated no provisions of the constitution of the United States." Chief Justice Waite, speaking for the court, said : "The Spring Valley Company is an artificial being, created by or under the authority of the legislature of California. The people of the State, when they first established their government, provided in express terms that corporations, other than for municipal purposes, should not be formed except under general laws, subject at all

times to alteration or repeal. * * * In California the constitution put this reservation into every charter, and consequently this company was from the moment of its creation subject to the legislative power of alteration, and, if deemed expedient, of absolute extinguishment as a corporate body." See *State* v. *Brown & Sharpe Manf'g Co.* 25 Atl. Rep. 246.

It is obvious that the legislature cannot, under the power to amend, take from corporations the right to contract; for it is essential to their existence. It can regulate it when the interest of the public demand it, but not to such an extent as to render it ineffectual, or substantially impair the object of incorporation. The constitution of this State, in reserving the power to amend or repeal, expressly provides that it may be exercised whenever, in the opinion of the legislature, the charter "may be injurious to the citizens of this State; in such manner, however, that no injustice shall be done to the corporators." Article 12, section 6.

Whenever the charters of railroad companies become obstacles in the way of the legislature so regulating their roads as to make them subserve the public interest to the fullest extent practicable, their charters are, in that respect, injurious to the citizens of the State, and can be amended as to defects in such manner as will be just to the corporators. For they are organized for a public purpose, and their roads are declared by the constitution to be public highways, and they are made common carriers. They are clothed with a public trust, and in many respects are expressly subjected by the constitution to the control of the legislature. There is no enterprise in which the public is so largely interested as it is in the successful and efficient operation of railroads. With the trust with which they are clothed is imposed the duty to serve the public as common carriers in the most efficient manner practicable. For this reason

the legislature may impose on them such duties as may be reasonably calculated to secure such results. Being created by statute, the legislature may so change them by amendment as to make them subserve the purpose for which they were created. If the legislature, in its wisdom, seeing that their employees are and will be persons dependent on their labor for a livelihood, and unable to work on a credit, should find that better servants and service could be secured by the prompt payment of their wages on the termination of their employment, and that the purpose of their creation would thereby be more nearly accomplished, it might require them to pay for the labor of their employees when the same is fully performed, at the end of their employment. If it be true that in doing so it would interfere with contracts which are purely and exclusively private, and thereby limit their right to contract with individuals, it would nevertheless, under such circumstances, have the right to do so under the reserved power to amend.

But we do not mean, by holding as we do, to intimate that the legislature can, by way of amendment, fix or limit the compensation of employees of railroad companies. That might seriously affect one of the principal charter rights of the companies, and thereby substantially impair the object of their incorporation. Such a power would be subversive of the right, and, when exercised to its fullest extent, would leave to the corporation the privilege of selecting its employees without the right of contracting with them. An amendment to that extent would be, manifestly, unjust to the companies, and violative of the constitution, which, while it grants the right to amend when in the opinion of the legislature the charter is injurious to the citizens, limits the right to do so to amendments that are just to the corporators. The act in question is not subject to that imputation. It is prospective in its operation, and leaves

to the corporations the right of making contracts with their employees on advantageous terms.

Is the act before us a proper amendment? It provides, among other things, that whenever any corporation "engaged in the business of operating or constructing any railroad or railroad bridge" shall discharge *with cause* any servant or employee thereof, "the *unpaid* wages of any such servant or employee, then *earned* at the contract rate, *without abatement or deduction*, shall be and become due and payable on the day of such discharge;" "and if the same be not paid on such day, then, as a penalty for such non-payment, the wages of such servant or employee shall continue at the same rate until paid." This provision is susceptible of two constructions, one of which makes the act require the corporation to pay the employee all the wages to which he would have been entitled had he fully performed his contract up to the time of his discharge, notwithstanding he had failed to do so, and had damaged the corporation thereby. If this be its intention, it is unconstitutional, because its enforcement might take property from the corporation without due process of law. For the employee is not entitled to the stipulated wages until he has performed the contract. He may have damaged his employer, by the failure to do so, in a sum larger than the wages he would have been entitled to receive in the event he had complied with his agreement. To compel the corporation, in such a case, to pay any sum whatever, would be a deprivation of property without due process of law. The same would be equally true if the corporation should be compelled to pay full wages when the damage caused by the non-performance of the contract does not exceed them. (*Com.* v. *Perry*, 155 Mass. 117.) Such an amendment of the charters of corporations is clearly unjust to the corporators.

<span style="float:right">2. Meaning of phrase "without abatement or deduction."</span>

The other construction is more reasonable. It makes the words "without abatement or deduction" mean "without discount." The legislature evidently thought that the employee might receive money or property in the course of his employment in part payment for his labor, and evidently intended that the wages thus paid should not be repaid. A strict construction of the words "without abatement or deduction" would deprive the corporation of a credit for the money or property in a settlement with its employee for his services. Then, again, the act requires the corporation to pay only the unpaid wages earned, at the contract rate, at the time of his discharge. Stipulated wages cannot be earned except by the performance of the contract by which the employer agrees to pay them. Obviously, then, the act means, by the words "without abatement or deduction," that the unpaid wages earned at the contract rate at the time of the discharge shall be paid without discount on account of the payment thereof before the time they were payable according to the terms of the contract of employment. When construed in this manner, this provision of the act is constitutional, and it is our duty to so construe it.

Tested by the principles of law we have indicated, the act under consideration is unconstitutional so far as it effects natural persons. As to corporations, it is a valid statute. It does not seriously impair their right to contract, but leaves them to contract with their employees on profitable terms.

So much of the act as is unconstitutional can be eliminated, and the remainder stand. (*State* v. *Marsh,* 37 Ark. 356; *L. R. & F. S. Ry.* v. *Worthen*, 46 Ark. 312; *State* v. *Deschamp*, 53 Ark. 490; *Davis* v. *Gaines,* 48 Ark. 370, 383.) After this elimination, so much of the first section of the act as remains in force reads as follows:

"Sec. 1. Whenever any corporation, engaged in the business of operating or constructing any railroad or railroad bridge, shall discharge with or without cause, or refuse to further employ, any servant or employee thereof, the unpaid wages of such servant or employee then earned at the contract rate, without abatement or deduction, shall be and become due and payable, on the day of such discharge or refusal to longer employ ; and if the same be not paid on such day, then, as a penalty for such non-payment, the wages of such servant or employee shall continue at the same rate until paid. *Provided*, such wages shall not continue more than sixty days, unless an action therefor shall be commenced within that time."

It cannot be truthfully said that so much of the act as we find to be in force is unconstitutional, because it interferes with the rights of employees to make such contracts with corporations as they see fit. As said in *State* v. *Brown & Sharpe Manufacturing Co.* 25 Atl. Rep. 253, "No inhibition is placed upon employees to make such contracts as they choose, with any person or body, natural or artificial, that is authorized to contract with them. But corporations are artificial bodies, and possess only such powers as are granted to them, and natural persons dealing with them have no right to demand that greater power should be granted to corporations in order that they may make other contracts with such corporations than the corporations are authorized to enter into."

The "act being general and uniform in its operation upon all persons coming within the class to which it applies, it does not (if amendments to charters can) come within that special legislation prohibited by the constitution. For it applies to and embraces all persons 'who are or may come into certain situations and circumstances,' and is general and uniform; not because it op-

3. The act not special legislation.

erates upon every person in the State, for it does not, but because every person who is 'brought within the relations and circumstances provided for is affected by the law.'' *L. R. & F. S. Ry. Co.* v. *Hanniford*, 49 Ark. 291; *McAunich* v. *Mississippi & Missouri Railroad Co.* 20 Iowa, 342; *Missouri Railway Co.* v. *Mackey*, 127 U. S. 205; *Minneapolis Railway Co.* v. *Beckwith*, 129 U. S. 27; *In re Fred Oberg*, 21 Oregon, 406; *Hawthorn* v. *People*, 109 Ill. 311; *Youngblood* v. *Birmingham Trust & Sav. Co.* 12 So. Rep. 579; Cooley on Const. Lim. (6th Ed.) 480, 481.

4. Jurisdiction of magistrate.

This action was brought before a justice of the peace for the recovery of wages earned, and the penalty or damages allowed by the act on account of the non-payment thereof from the time the wages were due to the day of bringing the suit. The question arises, did the justice of the peace have jurisdiction? We have held that a justice of the peace did not have jurisdiction in an action for the recovery of a statutory penalty. *B. & O. Tel. Co.* v. *Lovejoy*, 48 Ark. 301. On the other hand, the jurisdiction of justices of the peace in actions for the recovery of punitive or exemplary damages has been sustained. The question, then, is, is the amount allowed to the employee, in addition to the wages earned, a penalty or exemplary damages? The answer depends on the interpretation of so much of the act as is in the following words: ''And if the same (wages) be not paid on such day, then, as a penalty for such non-payment, the wages of such servant or employee shall continue at the same rate until paid.'' According to the act, the wages earned become due when the employee is discharged, or the employer refuses to longer employ him. The additional amount is allowed on account of the failure to pay the wages when due, and is regulated according to the length of the delay of payment. It is allowed for a double purpose, as a compensation for the delay,

and as a punishment for the failure to pay. It is composed of all the elements and serves all the purposes of exemplary damages. *Day* v. *Woodworth*, 13 How. 363; *Missouri Pacific Railway Co.* v. *Humes*, 115 U. S. 512; *Minneapolis Railway Co.* v. *Beckwith*, 129 U. S. 34-36; Sedgwick on Damages (6th Ed.), page 35. The name given to it by the act cannot change it. Our conclusion is, the additional amount is allowed as exemplary damages, and that the justice of the peace had jurisdiction in this action.

The judgment of the circuit court is, therefore, reversed, and judgment will be rendered by this court in favor of appellant against appellee for $27.90, and $3.50 as exemplary damages, the amount sued for, and all his costs.

BUNN, C. J., dissenting. The constitutionality of the act entitled "An act to provide for the protection of servants and employees of railroads," approved March 25, 1889, is called in question by the plea of the appellee company, which was sustained in the court below, and the appellant appeals to this court.

The majority of the court holds that the act in question, in so far as it affects private individuals, is unconstitutional, but that in so far as it affects corporations, it is constitutional; and, furthermore, that it is divisible, so that the unconstitutional part may be eliminated and the valid part may stand. The court also holds that the act, in fact, does not interfere with the right to contract, but only affects some of its incidents, if I fully comprehend its meaning. From the decision of the majority of the judges, I feel constrained to dissent, for reasons that follow.

Since the court, in its well considered opinion, holds that the act in question, according to the weight of authority, cannot stand upon the ground that is a legitimate expression of the police or of any of the other great

powers said to be inherent in government, I am relieved of the necessity of discussing the question involved from that standpoint, and therefore address myself directly to the consideration of the constitutional provision subjecting incorporation statutes to the legislative power of alteration and repeal on the one hand, and of alteration, revocation and amendment of charters on the other, to be found in section 6, article 12 of the constitution, from which, and from which alone, the court derives the authority to enact the act in question and similar acts.

The act is as follows: "Section 1. Whenever any railroad company or any company, corporation or person engaged in the business of operating or constructing any railroad or railroad bridge, or any contractor or subcontractor engaged in the construction of any such road or bridge, shall discharge, with or without cause, or refuse to further employ any servant or employee thereof, the unpaid wages of any such servant or employee, then earned at the contract rate, without abatement or deduction, shall be, and become due and payable on the day of such discharge, or refusal to longer employ; and if the same be not paid on such day, then, as a penalty for such non-payment, the wages of such servant or employee shall continue at the same rate until paid. *Provided*, Such wages shall not continue more than sixty days, unless an action therefor shall be commenced within that time.

"Sec. 2. That no such servant or employee who secretes or absents himself to avoid payment to him, or refuses to receive the same when fully tendered, shall be entitled to any benefit under this act for such time as he so avoids payment.

"Sec. 3. That any such servant or employee whose employment is for a definite period of time, and who is discharged without cause before the expiration of such time, may, in addition to the penalties prescribed by this

act, have an action against any such employer for any damages he may have sustained by reason of such wrongful discharge, and such action may be joined with an action for unpaid wages and penalty.

"Sec. 4. That this act shall take effect and be in force from and after its passage."

The constitutional provision referred to is in these words, viz: Article 12, sec. 6. "Corporations may be formed under general laws; which laws may, from time to time, be altered or repealed. The general assembly shall have the power to alter, revoke or annul any charter of incorporation now existing and revocable at the adoption of this constitution, or any that may hereafter be created, whenever, in their opinion, it may be injurious to the citizens of this State; in such manner, however, that no injustice shall be done to the corporators."

It is stated in the opinion of the court that the act would be treated as amendatory of our incorporation laws; and thus it was thought to give it the effect of accomplishing what is thought to be provided for in the section of the constitution quoted above. At the threshold of the discussion, therefore, we are confronted with a question of the most serious character. It is this: Can this court arbitrarily treat one statute as amendatory of another? That is to say, is it not a legal proposition of itself, whether any statute is amendatory of another, aside from the idea of both dealing with the same or kindred subjects? It will be observed that the act in question does not in terms refer to any other statutes, and, this being so, can any other statute be said to be amended by it?

Section 23, article 5, of the constitution is in these words, viz: "No law shall be revived, amended, or the provisions thereof extended or conferred, by reference to its title only, but so much thereof as is revived,

amended, extended or conferred, shall be reinstated and published at length." Now, if a law referring to a previous law by title only is not to be considered as amendatory of it, how much more true is it that a subsequent law, which does not refer even to the title of a former law, is not amendatory of the existing or former law?

The prohibition contained in this section of the constitution was not meant as an idle saying, a mere flourish of high sounding words, but was intended to subserve a great purpose—the protection of the citizen against surreptitious legislation. Nor has this court, nor the courts of other States, treated this and similar provisions as light and meaningless things. *Beard* v. *Wilson*, 52 Ark. 290 ; *Havis* v. *Jefferson*, 14 S. W. Rep. (Ark.) 1101 ; *Watkins* v. *Eureka Springs*, 49 Ark. 131 ; *Judson* v. *Bessemer*, 6 So. Rep. 267 ; *State* v. *City of Trenton*, 22 Atl. Rep. 731 ; *Board of Comr's*. v. *Aspen Mining Co*. 32 Pac. Rep. 717.

From the decisions on the subject, we gather this principle, that an act, as an independant law, may not be objectionable on constitutional grounds, and yet, as an amendment of some existing law, it may be invalid. The rule is a reasonable one, because no law should be altered or amended without something appears in the amendatory act to give notice to the public of a change in the original law, while if the new act is intended as an independent act, the original act is not affected, and there is nothing to take notice of.

This, perhaps, is enough to say on this part of the subject. The majority of the court, treating the act in question as an independent act, would hold it unconstitutional for reasons assigned in the opinion, which reasons we think sound and incontrovertible. But the majority of the court, treating the act in question as amendatory of our general incorporation laws, (the court does not say which one, for there are two or more,) holds it

to be constitutional under the power reserved to the legislature in the last sentence, (section 6, art. 12, of the constitution,) and I have endeavored to show that the act can have no place as an amendment, because it does not show a compliance with the constitution in the manner of its enactment as such amendment.

The last sentence of the sixth section of article twelve of the constitution manifestly refers to corporations created and to be created by special acts of the legislature, judging from the words employed and the context. Each charter is then made the subject of legislative alteration, revocation, and amendment, in case it becomes injurious to the citizens of the State, and provided it was revocable at the adoption of the constitution, if already in existence. The charters "hereafter to exist" were doubtless those special charters conferred by legislation to be expressed in special acts.

Now, it does not appear in this case what kind of a corporation the appellee company is, whether it was created under our general incorporation laws, or by special act of the legislature. As a matter of common knowledge, it may be assumed, however, that it was created by a special act, since it is now forty or more years since it became a matter of public concern, and since it had its origin at a time when there was no general incorporation law in this State. There could then be no grant of corporate powers for strictly private purposes. All such were considered in conflict with the constitutional prohibition of monopolies. Strictly public, or municipal, and *quasi* public, such as railroad corporations, were all that were allowable. The former were strictly at the will and pleasure of the legislature; the latter were the result of contract between the State and corporators, and by their contracts were both State and corporations to be governed. *The State* v. *Curran,* 12 Ark. 321. Of this latter class, presumably, was the

appellant company, and to show that its charter is the subject of legislative alteration, revocation or amendment we must look to the language of the contract—the charter—which does not appear in evidence in this cause.