## DOW V. BEIDELMAN.

1. GENERAL ASSEMBLY: *Submission of bills for approval.*

   An act was regularly passed by both houses of the General Assembly; but in its enrollment, two provisions which had been reported by a conference committee and incorporated in the act by way of amendment, were omitted. In this form the act was sent to the Governor, and was by him approved on March 30th. The next day the Legislature adjourned. After the adjournment the omissions were discovered. A correct enrollment was then made and the bill, signed by the President of the Senate and Speaker of the House, was again laid before the Governor, who approved it on April 4th. *Held:* That the Constitution (art. 6, sec. 15) does not require all bills to be presented to the Governor before the adjournment of the Assembly, and the first presentation of the bill being ineffectual, because it was not the same that had been passed, the legislative officers had the power after the adjournment to submit to the Governor for his approval a correct enrollment of the bill, as it was passed.

2. RAILROAD COMPANIES: *Provision in charter as to passenger rates.*

   A provision in the charter of a railroad company, that the charge for carrying passengers shall not exceed five cents per mile for each passenger, is not a contract on the part of the State, that passenger fare shall never be reduced below that rate. But if it were, the privilege conferred would not pass to the purchasers at a mortgage foreclosure sale, although the mortgage purports to transfer the charter; and the reorganization by such purchasers after the adoption of the present Constitution, creates a new corporation, subject to legislative control. (*Const., art. 17, sec. 10*).

3. SAME: *Act of 1887, regulating passenger rates, is constitutional.*

   The act approved April 4, 1887, providing a maximum schedule of charges for the carriage of passengers by railroads, and classifying railroads according to their length, operates uniformly on each class, and is not therefore special legislation within the constitutional prohibition. *L. R. & F. S. Ry. v. Hanniford, ante, 291.*

APPEAL from *Pulaski* Circuit Court.

J. W. MARTIN, Judge.

*U. M. & G. B. Rose* for appellant.

The act of March 30, 1887, is of no validity, because:

1.   It is a confiscation of private property.  *Const., art. 2, sec. 22, art. 12, sec. 6;  Const. U. S., 5th Amendment,* and *14th Amendment.*

Under the guise of *regulating*, the Legislature cannot reduce the compensation of railroads to a point which would virtually amount to confiscation.   *116 U. S., 331;  23 Fed. Rep., 529;  Cooley Const. Lim., 578;  21 Barb., 519;  2 Morawetz Corp., sec. 1075c;  Black Const. Prohibitions, sec. 26;  118 U. S., 394.*

2.   The act is special legislation, and makes arbitrary discriminations.   *Const., art. 5, sec. 25;  43 Ark., 42;  118 U. S., 369;  7 Atl. Rep., 283;  id., 286;  5 id., 215;  id., 739;  2 id., 658; id., 249;  40 N. J. L., 1;  46 id., 173;  39 N. J. Eq., 126;  39 id., 391;  14 Lea, 520;  80 Ky., 608;  75 Mo., 341;  88 Penn. St., 258; 84 Ill., 590;  71 Ga., 484;  2 Atl. Rep., 423;  1 id., 560;  6 id., 158;  6 N. E. Rep., 480;  42 N. J. L., 486;  44 id., 363.*

3.   The act was never passed.   The first bill was of no validity.   *41 Ark., 471.*

Every bill must be transmitted to the Governor before the adjournment of the Assembly, and be in his hands before it adjourns.   *Const., art. 6, sec. 15.*

Nor can a bill be enrolled after the adjournment of the Legislature.   The President of the Senate and Speaker of the House have no power to act after the adjournment.   Their power ceases with the adjournment.

Our position in reference to the passage of acts is this: That they are to be passed by the General Assembly and the Governor jointly, and that the Governor has no power to act without the Assembly, save where he is authorized by the Constitution ; that all bills must be transmitted to the Governor before the adjournment of the Assembly, and be in his hands before it adjourns, so that every member may inspect them there, and assure himself of the identity of the bills.

Dow v. Beidelman.

*W. S. McCain* for appellees.

The present company was never organized under the act of 1853. *41 Ark., 436; 112 U. S., 609.* If organized at all, it was under the Constitution of 1874, and subject to all its provisions and regulations. *Const., art. 12, sec. 6.* As to the power of the State to regulate rates, see *116 U. S., 307; 94 U. S., 113; id., 155.* Whether the regulation is reasonable or not is for the Legislature to determine, not the courts.

This court, however, is not called upon in this case to determine this difficult and important question. The right to repeal the charter and to stop the running of trains, and the collection of tolls altogether, is reserved by our Constitution. The man who takes a charter under our Constitution takes it with the express understanding that it may be recalled any day. Like him who loans his money to the State, the railroad incorporator must trust to the honor of the State. The property he may have earned, or the contracts he may have made up to the day of repeal, cannot be confiscated. The repeal cannot be made retroactive, but so far as it is prospective there can be no limit. *99 U. S., 700; 13 Gray (Mass.), 239, 253; 26 Ohio St., 86; 5 Bush., 458; 15 B. Mon., 349; 15 Wall., 478; id., 500; 95 U. S. 319; 1 Black, 587; 22 N. Y., 14; 96 U. S., 499; Wood on R. R., p. 1707, sec 496.*

2. As to the classification of railroads by their length, being a "local or special" law, see *18 Ohio St., 85; 77 Pa. St, 338; 85 id., 401; 88 id., 258; 112 id., 322; 106 id., 377; 40 N. J., 1; 48 id., 310.*

3. There is nothing in the claim that the bill was not properly passed.

The Constitution, article 17, section 10, required the Legislature to pass an act regulating fares and to enforce it by adequate penalties.

SMITH, J.   The complaint alleged that the defendants were the legal owners and in possession of the Memphis & Little Rock Railroad, which is more than one hundred miles long ; that on the 5th of May, 1887, the plaintiff had applied to the the ticket agent of defendants for a passenger ticket from Little Rock to Lonoke, and had tendered seventy cents in payment, the distance between the two stations being twenty-three miles; but the defendants had refused to carry for that sum, and had demanded and received from him one dollar and thirty cents for the service aforesaid.   Wherefore the plaintiff claimed the statutory penalty.

The defendants filed the following answer :

1.   " The defendants are operating the said Memphis & Little Rock Railroad under and by virtue of the charter granted to the Memphis & Little Rock Railroad Company by the State of Arkansas, in the act of the General Assembly of said State, approved January 11, 1853, under the provisions of which the defendants are authorized to charge for transportation of passengers at the rate of five cents per mile.

2.   " Said railroad was completed, and a great part of it constructed, upon the faith of the act of the General Assembly of the State of Arkansas, approved July 23, 1868, which provides that the rates of toll shall not be decreased, without the railroad company's consent, to such an extent that the profits of the railroad company shall be less than 15 per cent per annum ; and under the provisions of the act relied upon by plaintiff, the profits of said road would be greatly less than that rate, and no such reduction of rates has been consented to by these defendants, or any person or corporation who has ever been in possession of said road.

3.   " The expense of the construction of the railroad now operated by the defendants was about the sum of four millions of dollars, and it is now mortgaged for two millions eight hundred and fifty thousand dollars, bearing interest at the rate of

8 per centum per annum, and these defendants are in possession of said railroad as the trustees and representatives of the said mortgage bondholders. Under the provisions of the act relied upon by plaintiff the profits of the road will not exceed the sum of fifty-eight thousand dollars per annum, which will be less than one and one-half per cent upon the cost of constructing the railroad; and only a little over 2 per cent upon the amount of its bonded indebtedness. That its income before the passage of said act amounted to one hundred and sixty-two thousand dollars, net, and the act, if enforced, will operate as an almost complete confiscation of the defendants' property."

The cause was submitted to the court sitting as a jury, and judgment was rendered in favor of plaintiff for seventy-five dollars and costs.

Defendants filed a motion for a new trial, which was overruled, upon which they excepted and appealed.

A jury having been waived, the cause was tried before the court, and the facts were agreed as follows:

The Memphis & Little Rock Railroad Company was incorporated under the act of the General Assembly of the State of Arkansas, approved January 11, 1853, which act is taken as part hereof. See *Acts of 1852, p. 130.*

On May 1, 1860, it mortgaged its charter and property to Sam Tate, Robert C. Brinkley and Geo. C. Watkins, trustees.

On March 1, 1871, it executed a second mortgage on its property and charter to Henry F. Vail, as trustee.

On the 17th of March, 1873, this second mortgage was foreclosed by sale under the power, and the purchasers on November 17, 1873, organized a new company under the charter, which they called the Memphis & Little Rock Railway Company.

On December 1, 1873, the Memphis & Little Rock Railway Company mortgaged its charter and property to certain trustees. This mortgage not being paid at maturity, the trustees thereunder brought suit in the United States Circuit Court for the Eastern District of Arkansas, for its foreclosure, and the trustees in the mortgage of May 1, 1860, were, on their own application, made parties complainant; and on November 21, 1876, a final decree was entered in the cause, directing the foreclosure of both mortgages and a sale for their satisfaction.

On April 27, 1877, the mortgaged property was sold under the decree, including the charter; and the purchasers at the sale reorganized under the charter and called the new company the Memphis & Little Rock Railroad Company as reorganized.

On May 1 and 2, 1877, the said last-named company issued bonds and executed to the defendants its mortgages upon its property and charter, and default having been made in their payment, the defendants are in possession as trustees for the mortgage bondholders.

The legal right of the successive companies to reorganize under the old charter is not admitted.

The railroad was built prior to 1868 from Memphis to Madison and from Little Rock to Devalls Bluff. It was built through the intervening distance in 1869.

The expense of constructing the Memphis & Little Rock railroad was four millions of dollars, and the railroad company has a bonded indebtedness of two millions eight hundred and fifty thousand dollars, bearing interest at 8 per cent per annum, and the defendants are in possession as the representatives of the mortgage bondholders, default having been made in the payment of the interest on the bonds. The net income of the road for the year 1886 was one hundred and sixty-two thousand dollars, earned principally from passenger traffic, the

Dow v. Beidelman.

charge for transportation having been five cents per mile; and this has been about the average for recent past years. With the same traffic that the road has now, and charging for transportation at the rate of three cents per mile, the net income will only be fifty-eight thousand dollars per annum, which will pay less than one and one-half per cent on the cost of the road, and only a little over 2 per cent on its bonded indebtedness. The defendants do not anticipate any increase of traffic on account of the reduction, for the reason that the St. Louis, Iron Mountain & Southern Railway, from which the Memphis & Little Rock Railroad derives nearly all of its through business, is building a parallel branch from Bald Knob in the State of Arkansas to the city of Memphis, and this being a hostile and rival line to that of these defendants, will carry over that branch the through passengers who would otherwise go over the road of defendants. The most profitable traffic has been the through traffic, and the defendants anticipate a great diminution in their present traffic when said branch is completed, and it will, to all appearances, be completed during the summer of 1887.

The length of the defendants' road is one hundred and thirty-five miles. Forty miles of that distance, from Madison to Memphis, is through a swamp, in which there are virtually no inhabitants, and which is subject to overflow.

Either party may refer to the statements in reference to the railroads in Arkansas contained in Poor's Railroad Manual for 1886, and the same shall be taken as evidence of the facts therein stated.

Then follow details as to the length, cost of construction, net earnings, bonded indebtedness, and rate of charges of the principal railways in the State. No other testimony was introduced. And the defendants moved the following declarations of law:

" 1.   The act of the General Assembly of the State of Arkansas, being an act entitled 'An act to regulate the rates and charges for the carriage of passengers by railroads,' approved April 4, 1887, in so far as it relates to the present proceeding is unconstitutional, null and void; because, under the guise of regulating charges for the carriage of passengers on railroads, it amounts virtually to the confiscation of the property of the railroad in the hands of these defendants, and is ah unreasonable, unjust and oppressive taking of private property for public uses without compensation, in violation of the Constitution of the State of Arkansas and that of the United States.

" 2.   That the said act of the General Assembly is unconstitutional, because it is special legislation, and makes arbitrary discriminations between different railroads, not based either upon their value, their earnings, or other valid grounds, but based simply on the respective lengths of the several railroads.

" 3.   That there is no legal evidence that said act was ever passed by said General Assembly and approved by the Governor of the State, in the manner required by the Constitution, and that therefore said act is null and void.

" 4.   That upon said findings of fact the judgment of the court should be for the defendants."

But the court refused to make either of said declarations of law, and to its refusal to give each one of them, the defendants at the time excepted and saved their exceptions in the proper form.

The act provides a maximum schedule of charges for the transportation of passengers as follows:   On lines of railroads fifteen miles or less in length, eight cents per mile.   On lines over fifteen and less than seventy-five miles in length, five cents per mile.   And on lines exceeding seventy-five miles in length, three cents per mile.   And it further provides that any corporation, officer of court, trustee, person or association of

Dow v. Beidelman.

persons, operating a railroad in this State, who shall charge or take any greater compensation for the carriage of passengers, shall forfeit and pay for any such offense not less than fifty nor more than $300, to be recovered by the party aggrieved in any court of competent jurisdiction. *Acts of 1887, p. 227.*

It is denied that this law was enacted in accordance with the forms prescribed by the Constitution. It appears that the act was regularly passed by both houses of the General Assembly; but in its enrollment, two provisions, which had been reported by a conference committee and incorporated in the act by way of amendment were omitted. In this form it was sent to the governor and was by him approved on March 30. The next day the General Assembly adjourned. After the adjournment the omissions were discovered. A correct enrollment was then made and the bill, signed by the President of the Senate and Speaker of the House, was again laid before the Governor, who approved it on April 4th.

1. GENERAL ASSEMBLY: Submission of bills for approval.

The first presentation and approval were of no validity because it was not the same bill that had been passed by the Legislature. *Smithee v. Campbell, 41 Ark., 471.*

The question then is resolved into this: Whether a bill, that has passed both houses, may be submitted to the Governor for his approval after the adjournment of the Legislature, or whether it must be presented to him while the legislative body is still in session. The Constitution ordains that every such bill shall be presented to the Governor. If he approve it, he shall sign it; but if he shall not approve it, he shall return it, with his objections, to the house in which it originated; which house shall proceed to reconsider it.

" If any bill shall not be returned by the Governor within five days, Sundays excepted, after it shall have been presented to him, the same shall be a law in like manner as if he had signed it, unless the General Assembly by their adjournment

prevent its return, in which case it shall become a law unless he shall file the same, with his objections, in the office of the Secretary of State, and give notice thereof by public proclamation within twenty days after such adjournment." *Const. art. 6., sec. 15.*

Nothing in this language implies that all bills must be transmitted to the Governor before the adjournment of the Assembly. He is prevented by the adjournment from returning the bill, whether the bill is in his hands before it adjourns or reaches his hands afterwards. The term of members does not expire when it adjourns, nor do all the functions and powers of its officers then cease. It may often happen, in the case of bills passed in the closing hours of a session, that there is not sufficient time to enroll them properly and present them to the executive, before an adjournment takes place. The effect is not that, under the circumstances, the bill fails to become a law. Our constitutional provision differs materially in this respect from section 7 of article 1 of the Constitution of the United States.

The power of the Legislature to regulate the charges of common carriers, unless restrained by contract, or unless what is done amounts to a regulation of foreign interstate commerce, is not open to controversy. The power has been exercised for near two hundred years. *Railroad Commission Cases, 116 U. S., 325,* and cases there cited.

2. RAILROAD COMPANIES: Provision in charter as to passenger rates. It is contended, however, that by the charter of the Memphis and Little Rock Railroad Company, the exclusive power of regulating its tolls for the transportation of passengers was conceded to that corporation. The sixth section of the charter did indeed provide that the charge of transportation should not exceed five cents a mile for every passenger. This is very far from being a contract on the part of the State that passenger fare should never be reduced below that rate. But even if it had been, it was decided in *M. & L. R. R. Co. v. Berry, 41*

*Ark., 436;* affirmed on error *112 U. S., 609,* under the style of *Memphis & Little Rock R. Co. v. Railroad Commissioners,* that the privileges conferred by this charter on the original company did not pass to the purchasers at a mortgage foreclosure sale, who subsequently reorganized as a railroad company, notwithstanding the mortgage purported to transfer the charter. Such reorganization did not take place until the year 1877, after the adoption of the present Constitution, which enjoins upon the General Assembly to pass laws to prevent excessive charges by railroad companies for transporting freight and passengers and to enforce such laws by adequate penalties and forfeitures. *Art. 17, sec. 10.*

In reply to the suggestion that the earnings of the road will be reduced by the change to the point of confiscation, we have seen that the new corporation which issued bonds and executed the mortgages, under which the defendants are in possession, came into existence subject to legislative control. Such being the case, it was competent for the Legislature to fix a maximum, beyond which any charge would be unreasonable and such maximum would be binding on the courts as well as the parties. *Munn v. Illinois, 94 U. S., 113.*

And even if the ultimate determination of the reasonableness of rates of carriage is with the courts, and not the Legislature, we cannot say, from anything that is contained in this record, or judicially known to us, that a statute, which prescribes a compensation of three cents a mile for carrying passengers, works such a crying injustice to the defendants as to call for judicial interference. It is further objected that the act is special legislation and makes arbitrary discriminations. These objections are sufficiently answered in *C. B. & Q. R. R. Co. v. Iowa, 94 U. S., 155,* where a similar statute was under consideration.

3. SAME: Act regulating passenger rates, constitutional.

The statute dividing railroads into classes according to

their length, operates uniformly on each class; and this is all that is required. *L. R. & F. S. Ry. v. Hanniford, ante 291.*

Judgment affirmed.