Hon. EDGAR N. HARWOOD,
Hon. WILLIAM H. DE WITT, } Associate Justices.

---

## STATE EX REL. LLOYD *v.* ROTWITT, SECRETARY OF STATE.

[Submitted September 27, 1894. Decided October 1, 1894.]

CONSTITUTIONAL LAW—*Special legislation—Location of seat of government.*—The act of March 6, 1891, entitled "An act providing for the submission of the question of the permanent location of the seat of government," operates alike and uniformly upon all persons and places brought within its purview, and is not open to the objection that it is special legislation, and, therefore, unconstitutional and void.

MANDAMUS—*Performance of ministerial duties.*—Where an officer's duty is a simple, defined duty, purely ministerial, arising under circumstances admitted or proved to exist, and imposed by law, and he refuses performance in advance of the time fixed by law therefor, *mandamus* will at once lie to compel a performance at the proper time; and the court will not wait to determine whether or not he should perform until some future time when litigation arose, and when it was too late to require the performance of the defined duty. (HARWOOD, J., dissenting.)

(29)

MANDAMUS to compel the secretary of state to perform certain acts. Dismissed.

*W. W. Dixon,* and *M. Kirkpatrick,* for Relator.

*Henri J. Haskell, attorney general,* for Respondent.

DE WITT, J.—This is a hearing upon the return of an alternative writ of *mandamus.* The alternative writ of this court was issued September 24th, commanding the secretary of state to perform certain acts, or show cause, on September 27th, why he should not be required so to do. The question involved is the refusal of the secretary of state to do certain acts alleged by relator to be his duty, enjoined by the Ballot Law of 1889 (Laws 16th Sess., p. 135). To arrive at an understanding of the question presented the following facts may be stated: The constitution of the state provides: "At the general election in the year one thousand eight hundred and ninety-two the question of permanent location of the seat of government is hereby provided to be submitted to the qualified electors of the state, and the majority of all the votes upon said question shall determine the location thereof. In case there shall be no choice of location at said election the question of choice between the two places for which the highest number of votes shall have been cast shall be, and is hereby, submitted in like manner to the qualified electors at the next general election thereafter; *provided,* that until the seat of government shall have been permanently located, the temporary seat of government shall be and remain at the city of Helena." (Const., art. X, § 2, p. 38.) The second legislative assembly, on March 6, 1891, and before the first vote upon the question of the permanent location of the seat of government was to be had, passed "An act providing for the submission of the question of the permanent location of the seat of government." (See Laws 1891, 2d sess., p. 291.) This act differs in some details from the General Ballot Law of 1889. (Laws 1889, 16th sess., p. 135.) These details will be noted below. The affidavit filed, upon which the application was made, and upon which the alternative writ of *mandamus* was issued, is as follows, in full:

"IN THE SUPREME COURT
of the
STATE OF MONTANA.

STATE OF MONTANA,     } ss.
County of Lewis and Clarke.

"Charles F. Lloyd, being first duly sworn, deposes and says: That he is a resident of the county of Silver Bow, state of Montana, and is a citizen of the United States and of the state of Montana, and is a duly qualified elector and taxpayer of said state. That under and by virtue of the provisions of section 2, article X, of the constitution of the state of Montana, the question of the permanent location of the seat of government of the said state was duly submitted, at the general election held in the said state in the year 1892, to the qualified electors thereof. That more than two cities or towns of the said state of Montana were voted for at the said election, but neither of the places voted for received a majority of all the votes cast upon the said question, and there was no choice of location at the said election. That Helena and Anaconda, two of the cities of the said state of Montana, voted for at the said election, received the highest number of votes cast at the said election, and the question of choice between the said two cities—that is to say, the question as to which one of the said two cities shall become the permanent seat of government of the said state—is directed by the constitution thereof to be submitted to the qualified electors of the said state at the general election to be held therein on the sixth day of November, 1894. That Louis Rotwitt is the secretary of state of the state of Montana, duly elected, qualified, and acting. That by section 14 of the act of the legislature of the former territory of Montana, entitled 'An act to provide for printing and distributing ballots at the public expense, and to regulate voting at territorial and other elections,' approved March 13, 1889, which is a law of said state, it is, as affiant is informed and believes, made the duty of the said Louis Rotwitt, as such secretary of state, not less than thirty days before the said election last above named, to certify to the clerk of each county in the said state of Montana the said question of choice between the said cities of Helena and Anaconda for the

permanent seat of government aforesaid, and it is thereby
made the duty of the clerk of each county to include the same
in the publication which he is directed to make by the tenth
section of said act; and it is further, by said act, made the
duty of the clerk of each county to provide and have printed
for the use of the electors of his county, the regular general
ballots for said election, and to have printed on the said bal-
lots the said question, in such form as will enable the electors
to vote thereon in the manner provided by the said act; and
it is further provided by said act that ballots other than those
printed by the said county clerks, respectively, according to
the provisions of said act, shall not be cast or counted in any
election.     This affiant is informed and believes that the said
Louis Rotwitt, as secretary of state aforesaid, does not intend
to comply with, and will not comply with and observe, the
provisions of the above-recited act of March 13, 1889.     That
he does not intend to and will not certify said question of
choice between Helena and Anaconda aforesaid to the county
clerks, as required by said act; and that he intends and is
about to prepare and have printed a ballot other than the gen-
eral official ballot which said clerks are required by said act
to prepare and have printed—that is to say, a separate ballot
upon said question of choice between said cities; and that he
intends to distribute the same in sufficient quantities to said
clerks as official ballots, to be by said clerks distributed for
the use of the electors of their respective counties in voting
upon said question.     That said Rotwitt intends, and will,
unless otherwise directed by this court, proceed in the matter
of said election under the provisions of the act of the legisla-
ture of the state of Montana, entitled 'An act providing for
the submission of the question of the permanent location of
the seat of government,' approved March 6, 1891; whereas,
affiant is advised and alleges that the said act last named is
unconstitutional and invalid, and that the said act of March
13, 1889, heretofore referred to, is the law which should gov-
ern the action of the said secretary in the submission of the
said question to the electors of Montana, and under which the
said secretary should proceed to perform the duties required
of him by law.     Affiant is advised that said contemplated and

intended action of the said Louis Rotwitt, secretary of state, aforesaid, is illegal, and not in conformity with the requirements of the law of Montana in such case made and provided. This affiant states that he has demanded, to wit, on the twenty-fourth day of September, 1894, of the said Rotwitt, secretary of state aforesaid, that as such secretary he conform to and observe the requirements of the said act of March 13, 1889; but that he, the said Rotwitt, refused, and still refuses, to do so, and refuses to certify said questions of choice to said clerks, and declares his intention to prepare, have printed, and distribute said separate ballot as the official ballot upon said question, for the use of the electors throughout said state at said election. That by the provisions of said act of March 13, 1889, the said secretary of state is required to certify to said county clerks the said question of choice, not less than thirty days before the said election, to wit, on or before the sixth day of October, 1894; and it is therefore necessary that the validity of the action intended to be taken by the said secretary, as hereinbefore set out, should be determined by the court as speedily as possible. That there is no plain, speedy, and adequate remedy in the ordinary course of law. Wherefore, he prays that this honorable court may order the issuance of an alternative writ of mandate, commanding said Rotwitt, as such secretary of state, immediately after the receipt of said writ, to certify said question of choice to the clerk of each of the counties of the state of Montana, as required by the said act of March 13, 1889, and to conform in all respects in the submission of said question to the requirements of said last-mentioned law, or to show cause, at such special time and place as the court may appoint, why he has not done so.

"CHARLES F. LLOYD.

"Subscribed and sworn to before me this 24th day of September, A. D. 1894.          BENJAMIN WEBSTER,          [L. S.]

"Clerk of the Supreme Court, State of Montana."

The alternative writ issued upon this application commanded the respondent that, upon the receipt of the writ, he proceed to certify to the clerk of each county the question of the choice between the cities of Helena and Anaconda for the permanent seat of government, and to do all other things upon

his part required to be done by the act of March 13, 1889, or that he show cause before this court, on September 27th, why he should not do so. The respondent made return to the writ September 27th. He admitted that he did and does refuse to certify the names of said cities, as above described, and that he does not intend to follow certain provisions described of the General Ballot Law of 1889, but that he will perform the duties as to the capital election as laid down in the act of 1891, described in the relator's affidavit. The question presented is whether it is a duty enjoined by law upon the secretary of state to perform the said certain acts defined by the law of 1889.

The General Ballot Law of 1889, popularly known as the "Australian Ballot Law," was a part of the body of the territorial laws existing at the time of the adoption of the constitution, and became, with the adoption of the constitution, a law of the state. It was such when the second legislative assembly met in 1891. The legislature found that in the following year—1892—the question of the location of the state capital was, by the constitution, to be submitted to the electors of the state. It would appear that the legislature considered that the General Ballot Law of 1889 was not, in all of its provisions, a wholly suitable method for submitting the question of the capital location. They therefore enacted the law of March 6, 1891. (See 2d Sess. Laws, p. 291.) This law provided a method for submitting this question to the electors, which followed the general spirit and system of the General Ballot Law—the system, as we have observed, which is called the "Australian Ballot Law." But this law of 1891 differs from the law of 1889 in some of its details. For example, it requires the secretary of state to publish the notices of election, and to prepare, print, and distribute to the county clerks the ballots upon the capital question; whereas the law of 1889 required that the secretary of state should certify all questions to be submitted to the people to the clerk of each county, and it was the duty of the county clerk to include such question in the publication which he made. (See Ballot Law of 1889, § 14.) The relator here demands that the secretary perform the duty enjoined upon him by the law of 1889, and that he

certify the names of the cities to be voted for to the county clerk of each county, and perform all other acts required by the law of 1889. The secretary contends that he is not enjoined by law to perform the said duties defined by the act of 1889, where there are other acts required by the law of 1891 which are inconsistent with the law of 1889.

The writ of *mandamus* may be issued by this court to the secretary of state to compel the performance of an act which the law especially enjoins as a duty resulting from his office. (Code Civ. Proc., § 566.) The General Ballot Law of 1889 enjoins upon the secretary of state, as a duty resulting from his office, that he certify to the county clerks a question to be submitted to the people of the state, and that he do certain other things. He refuses to perform these alleged duties. Why? Because he contends that these certain provisions of the law of 1889 are in this case superseded by the law of 1891, and that, therefore, the said certain duties prescribed by the law of 1889 are not at this time duties enjoined upon him, but that he must, under the law of 1891, perform other and different duties inconsistent with the provisions of the law of 1889. This is an alternative writ of *mandamus*, whereby the respondent is commanded to do the act or acts named, or show cause why he should not be so required. He has shown his cause. We should naturally suppose that an inquiry upon a hearing of this sort would be, Is the duty alleged to be enjoined by law upon the secretary of state a duty so enjoined? The relator holds up the law of 1889, and says that it is. The secretary appeals to the law of 1891, and says that it is not. How can we determine whether the law of 1889 does indeed enjoin the duties under consideration, and alleged to rest upon the secretary of state, unless we determine whether the law of 1889 is of force as to the secretary of state in this matter, and controls and commands his action? If it does so control and command him he is refusing to perform a duty enjoined by law as a result of his office. If it does not so control and command him he is not refusing to perform a duty enjoined upon him as a result of his office. This seems to be a matter to determine. We know of no way to determine it except to inquire whether the said provisions of the law of 1889 are superseded,

as to this capital election, by the law of 1891; for, if not so
superseded, they would seem to be in force as against the secre-
tary. This involves, of course, deciding whether the law of
1889 or the law of 1891 is the rule of action for the secretary
in this matter. To be sure, it is not the function of a court to
advise a state officer as to his duty, or to decide fictitious cases
for the information or enlightenment of any one. But if decid-
ing a contention does inform and enlighten a state officer, or
any one else, that fact is not, in itself, an objection to the mak-
ing of a decision. It would seem to be necessary to decide, in
a *mandamus* case, whether the duties alleged to rest upon
respondent by provision of statute do so rest upon him in the
particular matter under consideration; and we do not under-
stand why such decision should not be gone into because it
requires the determination as to which of the two laws should
be followed by the secretary of state, or because, by reason
thereof, such an officer obtains light upon such subject. In
the case at bar we are clearly of opinion, as shown below, that
the secretary of state is correct in obeying the provisions of the
law of 1891, and ignoring the provisions of the law of 1889,
where the two are in conflict. He is performing his duty, and
is not refusing to perform any duty enjoined by the law of
1889. That is the question raised upon considering whether
the alternative writ shall be made peremptory. And, because
the secretary of state is not so refusing to perform a duty
enjoined by law, it will be ordered that this alternative writ of
*mandamus* be dismissed.

There has come into this case a suggestion that this is not a
proper case of *mandamus* to be entertained by this court. We
do not quite understand the ground of this suggestion. If it
be that the secretary of state is performing his duty, and not
refusing to perform any duty, and that, therefore, we have
naught to do with him, that brings the consideration right
down to our position; that is, that we dismiss the writ because
the alleged enjoined duty is not indeed so enjoined. But if
conditions were reversed, and the secretary were indeed refus-
ing to perform a duty clearly enjoined upon him as a result of
his office, we understand that a *mandamus* would lie. (Code
Civ. Proc., § 566.) And we see no reason why it should not

lie upon the refusal of the secretary at a time when the writ would have the effect of accomplishing the performance of the enjoined duty by the secretary, instead of waiting for the time when it was too late for performance, and the evil results of the nonperformance, if any there were, had become accomplished facts, and irremediable.   These duties of the secretary of state, under the election laws, are ministerial, and not judicial, and we do not understand that decisions of courts are in point which refused *mandamus* or injunction sought to be directed to judicial officers to command them how to perform judicial acts; that is, deciding for such judicial officers which of two or more courses they should pursue, the pursuance of which rested within their judicial discretion.   Such cases, not here in point, are found in *Gaines* v. *Thompson*, 7 Wall. 347, and the cases there cited.   The books are full of decisions to the same effect. The distinction between these cases and that before us is perfectly apparent, and does not need comment.   The following is quoted in *Gaines* v. *Thompson*, 7 Wall. 347, from *State of Mississippi* v. *Johnson*, 4 Wall. 475: "A ministerial duty, the performance of which may, in proper cases, be required of the head of a department by judicial process, is one in respect to which nothing is left to discretion.   It is a simple, definite duty, arising under circumstances admitted or proved to exist and imposed by law."   So, in the case at bar, the duty of the secretary of state, under the law of 1889, is "a simple, definite duty, arising under circumstances admitted or proved to exist, and imposed by law," if the law of 1889 is in force; and whether that law is in force as to this matter is the question before us.

We have said thus much upon this branch of the case.   It was not mentioned by counsel, and we should not have treated it had it not been an occasion for disagreement among the members of this court.   It is quite true that the contention of relator's counsel was not strenuous, and they made no vigorous effort to support the position of their client.   Indeed, it may as well be as frankly stated in this opinion, as it was in the argument of counsel, that the counsel considered that it was not so important how this case was decided as that it be decided. But we do not think that this is a reason for our not deciding

it at all. The contention is here made by the record, and we
have quoted the affidavit on the application in full; and, exam-
ining the case upon the record, we think that there is sufficient
therein to entitle both parties to a decision. In consideration
of the view that we take of the merits of this application no
harm would be done in this case if we expressed no opinion as
to whether the duty is enjoined upon the secretary to follow
the said certain provisions of the law of 1889 which are under
consideration. But cases could readily arise where great harm
would occur if the court were to stand idly by, and refuse a
decision to an applicant for *mandamus,* who sought to compel
an officer to do a ministerial act, and sought to compel him at
the only time when the doing thereof would be effective. Take,
for example, the case of *State* v. *Tooker* (decided by this court
September 24, 1894), *ante,* p. 8. There the secretary of state
did not publish a proposed amendment to the constitution in
the time required by the constitution. If, in time to make that
required publication, application had been made in this court
stating that the secretary refused to make such publication,
and would not make it, as required by law, we are of opinion
that the court would issue a *mandamus* requiring him to do so,
and would not wait to determine whether or not he should do
so until some future time when litigation arose, and when it
was too late to require the performance of that defined duty.

Coming to the merits of this application, the position of the
relator is simply this: The law of 1889 must now obtain,
because the law of 1891 is unconstitutional and void, and is
not a law. It is unconstitutional because it is special legisla-
tion, and prohibited by the provisions of the constitution,
which states that the legislative assembly shall not pass any
local or special laws in any of the following enumerated cases,
among others: The opening or conducting of any election, or
designating the place of voting. The suggestion is made that
this law of 1891 is invalid, as falling under the ban of this
prohibition, in that it is a special law as to conducting an elec-
tion. As above noticed, the contention to this effect was not
at all strenuous, and we are of opinion that it clearly cannot
be sustained. In the case of *In re Dewar's Estate,* 10 Mont.
426, this court had under consideration an act of the legisla-

ture changing the fees of a public administrator. It was sought to apply to that act of the legislature the provisions of the restriction act of Congress, which controlled our legislature then, as does the constitution above cited now. In that case we said: "The restriction act forbade only the passing of any local or special law upon the subject indicated. The only inquiry, therefore, before us is whether the act of September 14, 1887, was local or special. The operation of the act is not upon any particular person or officer, nor in any certain locality or localities in the territory. It applies to all executors and administrators, public and private, throughout the territory. What shadow or pretense of reason there is to pronounce this act local or special is not apparent to us. On the other hand, that it is not local or special seems to us perfectly clear, and so undisputably sustained by the decisions that to discuss the proposition or review the cases would be an uninstructive compiling of elementary and well-understood law. Suffice to refer to a few authorities: *State* v. *Parsons*, 40 N. J. L. 1; *Wheeler* v. *Philadelphia*, 77 Pa. St. 338; *McAunich* v. *Mississippi etc. R. R. Co.*, 20 Iowa, 338; *Haskel* v. *Burlington*, 30 Iowa, 232; *Iowa R. R. Land Co.* v. *Soper*, 39 Iowa, 112; *Little Rock etc. Ry. Co.* v. *Hanniford*, 49 Ark. 291; *Dow* v. *Beidelman*, 49 Ark. 325; *Montague* v. *State*, 54 Md. 481; *Abeel* v. *Clark*, 84 Cal. 226; *State* v. *Miller*, 100 Mo. 439; *Longan* v. *County of Solano*, 65 Cal. 122; *Brooks* v. *Hyde*, 37 Cal. 366; *Humes* v. *Missouri Pac. Ry. Co.*, 82 Mo. 221; 52 Am. Rep. 369; *Skinner* v. *Bogert*, 42 N. J. L. 407; *Ewing* v. *Hoblitzelle*, 85 Mo. 64; *State* v. *Tolle*, 71 Mo. 650; *Darrow* v. *People*, 8 Col. 417; *In re Church*, 92 N. Y. 1; *State* v. *Hawkins*, 44 Ohio St. 98; and many cases in Sedgwick on Statutory and Constitutional Law, 534, 535, 539, notes." (*In re Dewar's Estate*, 10 Mont. 442, 443.)

Looking at the act of the legislature as to the capital location ballot from the point of view of the prohibition of the constitution, it is seen, in the language of the Dewar case, that the operation of the act is not upon any particular person or officer, nor in any certain locality or localities in the state. It applies to all persons alike. It is not a local law. It extends over the whole state. It applies to every county, every

precinct, and every voter. Every voter in the state casts his votes for the capital under its provisions. There is no suggestion made as to why it should be considered a special law, and no reason to this effect occurs to us. Although the law of 1889 was adopted by the constitution, it was a law only until changed by future legislation. It was not wholly suitable and applicable to this capital election. In these details the law of 1891 made some changes. It operates uniformly upon all persons who are brought within the relations and circumstances provided for by it. It is said in *McAunich* v. *Mississippi etc. R. R. Co.*, 20 Iowa, 343, in speaking of a law contended to be special: "It applies to all railroad corporations now in existence, or which may hereafter exist, and is just as general and uniform as it would be if applied to all common carriers; and, in the latter case, it is conceded by appellant's counsel in their printed argument, the law would be valid. Very many laws, the constitutionality of which is not doubted, do not operate alike upon all citizens of the state. Take the case of the general laws for the incorporation of cities and towns, which is one of the special cases enumerated in article 3, section 30, *supra*, in which the laws must be general and of uniform operation. By these laws certain rights, powers, and privileges are conferred upon cities of the first class, of which there are but three or four in the state. Certain other different and less powers and privileges are conferred upon cities of the second class, and still different and less upon towns. The same is true of corporations organized for different purposes. Each class has its powers and privileges, different from the other. These laws are general and uniform, not because they operate upon every person in the state, for they do not, but because every person who is brought within the relations and circumstances provided for is affected by the law. They are general and uniform in their operations upon all persons in the like situation, and the fact of their being general and uniform is not affected by the number of persons within the scope of their operation." (Pages 343, 344.) So with our act of the legislature of 1891; it operates alike and uniformly upon all persons and places brought within its purview. The law is not special, and is not unconstitutional.

That there is a proper case before us for the expression of this view we have attempted to show above. It is ordered that the writ be dismissed.

PEMBERTON, C. J., concurred.

HARWOOD, J., dissenting.—This proceeding ought to have been dismissed without considering and deciding the questions presented thereby, because, according to the course of law and practice, these questions are not now properly before this court for determination. Neither the writ of *mandamus* nor injunction can be legally invoked as an indirect method of instructing or advising officers of the executive department as to duties imposed upon them by law, and in what manner they shall perform the same, especially in cases like the one at bar, wherein the officer asserts his intention to perform the duties required when the time arrives for his action. (*Gaines* v. *Thompson,* 7 Wall. 347; *Arberry* v. *Beavers,* 6 Tex. 457; 55 Am. Dec. 791.) Nor can the consideration of courts be legally invoked to determine a mere dispute raised by an individual with an officer as to what particular public duties the law imposes upon his office for future execution. The facts presented in this case show simply such a dispute, raising a feigned issue for the purpose of drawing from this court, if possible, an authoritative judicial response determining the same, and thereby to instruct and direct the secretary of state in the future performance of his duties on the subject mentioned. The courts have uniformly refused to entertain and respond to that character of issues, whether sought to be presented by *mandamus* or injunction. Therefore, in my opinion, this proceeding should have been dismissed with that remark, and without deciding the dispute sought to be presented for determination. The writ of *mandamus* lies in cases (where there is no other plain, speedy, and adequate remedy) to compel the performance of ministerial acts enjoined upon an officer by law, which acts the proper officer refuses to perform. This proceeding involves no such case. Nor is it even so pretended in the argument thereof by relator's counsel. The case presented by relator's petition, in substance, is that the permanent location of the capital or seat of government of

this state being a question required by law to be submitted to
the qualified electors thereof at the next ensuing general elec-
tion, and the secretary of state being required by law to per-
form certain official acts in relation to the submission of that
question, he must, by careful consideration of the provisions
of the law, and perhaps by availing himself of legal counsel,
ascertain what acts or duties the law prescribes for him to
perform in reference to that subject; that in view of those con-
ditions it appears relator, a citizen and qualified elector, called
upon the secretary of state, and inquired of him how he pro-
posed to discharge said duties.   If the secretary of state had
replied that he proposed to discharge those duties as the law
prescribed it would then have been difficult for relator to
have raised any controversy with the secretary upon the sub-
ject.   In such event relator would have been unable to ac-
complish the end sought, that is, to raise a dispute with the
secretary of state as to what the law requires of him in the
premises, and bring that controversy immediately into court
for decision, unless relator had applied to the court by way of
writ of *mandamus* to compel the secretary of state to narrate
to relator or his counsel, in detail, all of the acts and things
which the law required of him on that subject, as he under-
stood it.   But the secretary of state, having informed himself
of the duties devolving upon his office in this matter, oblig-
ingly pointed out to his interrogator the law governing his
action, and the particular acts he must perform in order to
fulfill its requirement, as the secretary of state understood it.
And according to the decision of the majority of this court the
secretary had so carefully considered the various provisions of
law on this subject as to be correct in his interpretation of
them in ascertaining his duties in the premises.   The time
had not yet arrived for action by the secretary of state when
he was thus interrogated by the relator, but his duties were to
be performed in the future.   He neither refused nor proposed
to neglect the performance of any duty in the premises re-
quired of him by law, as he had ascertained and understood
the requirements of law; but, on the contrary, asserted his
purpose to discharge all of these duties at the time and in the
manner prescribed.   But, as appears, in order to bring a case

into court, and procure, if possible, a judicial decision, in advance of any action on the part of the secretary of state, either affirming the correctness of the secretary's interpretation of the laws relating to the submission of said question or pointing out some error therein, relator demanded, as he alleges, that the secretary of state, when the time for action on his part should arrive, shall do otherwise than his counsel, consideration, and judgment had led him to believe the law required of him in discharging his public duties on that subject. In other words, the demand was that the secretary of state should adopt and follow another interpretation of the law, proposed or suggested by the relator; and, upon the secretary declining to comply with such demand, or declining, rather, to promise to adopt and follow the interpretation suggested by relator, who assumed the role of interrogator and counselor of the secretary of state, relator straightway brings into this court, under the name and style of a *mandamus* proceeding, the dispute which he had thus raised with the secretary, and seeks from this court a response as to whether relator's contention is correct, or whether the secretary of state had rightly interpreted the provisions of the law on the subject under discussion. In the presentation of the case relator's counsel frankly admit that they are quite indifferent as to which way the decision may turn, so that there is a decision of the dispute, carrying the authority and weight of a determination of this tribunal. They wished merely to propound to this court the question which relator has raised with the secretary of state, and receive a response in the form and bearing the weight of a judicial determination by this court as to which of the two possible interpretations of the law must be followed by the executive department of this state in discharging in the future its public duties on that subject; in a case, too, where the particular officer of that department whose duty it is to act has signified his intention and determination to act fully as the law prescribes.

It is needless to do more than state the case, with the circumstances of its production, to show at once the entire lack of a legitimate cause for judicial determination set forth therein. Nor can the form of verbiage, nor the device of

feigned demand, infuse into it the substance of such a cause. Those devices only give it the mere sound of a proceeding in *mandamus.* Relator shows no substantial grievance whatever, either public or private, to be redressed, unless it be a mental grievance. His only grievance is that his mind is not quite clear as to whether the secretary's mind is clear on the subject of his duties in presenting the capital question to the people. The secretary of state shows, in his answer and presentation of his counsel, that he has, with much care and caution, sought out and arrived at a conclusion as to what duties devolve upon his office in this matter. He expresses no doubt about the correctness of his conclusion, and asserts his purpose to discharge those duties fully, unless interfered with by some superior power. Relator hopes the secretary is right, but still he gives this court to understand that there is a doubt in his mind—not exactly a reasonable doubt, which he or his counsel can well explain, or by reason of which they insist with emphasis on another interpretation, yet a vague doubt, accompanied by a slight fear that, if some one in the future should question the action of the secretary of state, it might occasion some inconvenience, haunts the mind of relator, as his counsel inform this court—which doubt and fear can only be dispelled, and relator's mind set at rest by a decision of this tribunal. Such is the case presented, and nothing more. There is no sanction in practice or precedent to warrant the entertainment and judicial consideration and determination of the question thereby propounded, unless this court propose to institute the practice of solemnly handing down responses to legal propositions which might in the future be involved in some cases. Something on the style of *responsa prudentum*, in vogue amongst the Roman jurists, but entirely distinguished therefrom, because the *responsa prudentum* "was not of the bench, but of the bar"; the opinions of learned jurists, not decisions promulgated by and endowed with the weight of judicial authority. (Maine's Ancient Law, 32; 1 Kent's Commentaries, 230.) In the case of *Gaines* v. *Thompson*, 7 Wall. 347, Mr. Justice Miller, delivering the unanimous opinion of the court, approvingly quotes from the case of *Commissioner of Patents* v. *Whitely*, 4 Wall. 522, the language of Chief Justice Taney,

as follows: "Some of the observations of Chief Justice Taney, in delivering the opinion in the former, are so pertinent to the case before us, and state so well the relations of the judicial branch of the government to the officers engaged in the executive branch, that they may well be reproduced here. Speaking of the functions of these officers he says: 'In general, such duties, whether imposed by act of Congress or by resolution, are not mere ministerial duties. The head of an executive department of the government, in the administration of the various and important concerns of his office, is continually required to exercise judgment and discretion. He must exercise his judgment in expounding the laws and resolutions of Congress under which he is required to act.' 'If,' he says, 'a suit should come before this court which involved the construction of any of these laws, the court certainly would not be bound to adopt the construction given by the head of the department; and, if they supposed his decision to be wrong, they would, of course, so pronounce their judgment. But this judgment, upon the construction of the law, must be given in a case in which they have jurisdiction, and in which it is their duty to interpret the acts of Congress, in order to ascertain the rights of the parties before them. The court could not entertain an appeal from the decision of one of the secretaries, nor revise his judgment in any case where the law authorized him to exercise judgment or discretion. Nor can it by *mandamus* act directly upon the officer, and guide and control his judgment or discretion in the matters committed to his care, in the ordinary exercise of his official duties. . . . . The interference of the courts with the performance of the ordinary duties of the executive departments would be productive of nothing but mischief, and we are quite satisfied that such a power was never intended to be given them.' To the same effect are also the cases, *United States* v. *Seaman,* 17 How. 225; *United States* v. *Guthrie,* 17 How. 284; *United States* v. *Commissioner of Land Office,* 5 Wall. 563." Indeed, the whole opinion of Mr. Justice Miller in that case might be pertinently quoted here as showing that in entertaining and judicially treating the dispute presented in the case at bar this court has departed very far from the judicial province. To the same effect also

is the holding of the supreme court of the United States in the case of *Decatur* v. *Paulding,* 14 Pet. 497. But, as before observed, I apprehend the controversy presented by relator in this case is so obviously outside of the province of judicial cognizance that it ought to require no citation of authority to establish that suggestion. But the entertainment and decision of this case sets the precedent, and establishes the practice for its kind in this jurisdiction. Therefore, the way is open to call upon the judiciary to decide disputes which individuals may raise with public officers as to their public duties, prescribed by law for future execution, and which the officer in no manner proposes to neglect. But, in order to instruct them, or to obtain a judicial holding, in advance of their action, and in an *ex parte* proceeding, that the course about to be pursued is correct beyond all future question, let the person so desiring inquire what the officer proposes to do in respect to the subject, and dispute the correctness of his view, and demand that he do otherwise, however unfounded. There you have a case on all fours like the present one for judicial consideration and determination. This fashion of feigned dispute will no doubt be frequently resorted to in this jurisdiction as a convenient method of obtaining judicial decisions before action of the officer is taken, and before cases actually arise, "to save future inconvenience." It would apply conveniently to tax levies and sales, to quiet titles, etc., to questions as to issuing of bonds, sale of state lands, elections, and a multitude of other cases wherein officers of the executive department must perform public duties. Such actions will be brought for the purpose of instruction and repose. But, in my opinion, as said in *Gaines* v. *Thompson,* 7 Wall. 347, such "interference of courts with the performance of the ordinary duties of the executive departments would be productive of nothing but mischief."